GENERAL TIRE AND RUBBER COMPANY, Appellant and Cross-Appellee, v. THE INDUSTRIAL COMMISSION et al. (Aaron Harris, Appellee and Cross-Appellant).

Fifth District (Industrial Commission Division)   No. 5—91—0117WC

Opinion filed December 4, 1991.

Harry E. Kinzie III, of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, for appellant.

William D. Hanagan, of Hanagan & Dousman, of Mt. Vernon, for appellee.

JUSTICE STOUDER delivered the opinion of the court:

The petitioner, Aaron Harris, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*). He sought to recover for alleged injuries arising from his employment with the respondent, General Tire & Rubber Company. He also sought to recover penalties against the respondent for instituting a proceeding he claimed was frivolous. The arbitrator found in favor of the petitioner and awarded him 135²/₇ weeks of temporary total disability benefits (TTD) and $50,257 in medical expenses. The arbitrator denied the petitioner's claim for assessment of penalties. The Industrial Commission (Commission) affirmed the arbitrator's decision. The circuit court confirmed the Commission's decision. The respondent appeals, and the petitioner cross-appeals.

The record shows that this case involves two work-related injuries and three surgeries. The petitioner testified that on April 17, 1984, he was working as a lubricator for the respondent. He bent over to pick up a grease bucket but was unable to do so because it had become stuck to the floor by hardened rubber. As a result, he twisted his back and experienced a sharp burning pain down it.

He reported the occurrence to his boss and went to the nurse's station. Thereafter, he saw Dr. James Filberth, who examined him and treated him conservatively with heat, massages, and ultrasounds. Dr. Filberth later referred the petitioner to Dr. Anthony

Marrese, an orthopedic surgeon. The petitioner stated that he lost no time from work as a result of this injury.

The petitioner also testified that on July 11, 1986, he was working in the respondent's quality control laboratory when he slipped on some hydraulic oil on the floor and fell backwards over a piece of sheet metal. He struck his head on a pipe and struck his neck and shoulders on additional pipes lying on the floor. He was unable to get up due to the pain in his neck and low back and because when he attempted to use his arm to pull himself up it would strike a hot steam pipe.

The petitioner yelled for help and was eventually found by someone. He was put on a stretcher and taken to Good Samaritan Hospital. Thereafter, he was transferred to Wood River Township Hospital, where he was treated by Dr. Marrese. He stated that he had not worked since the July 11 accident, although he at one time requested light work from the respondent, which was denied.

The petitioner further testified that he had had continual pain in his lower back and legs since the July 1986 incident. In addition, he stated that he had pain in his neck and arms and that he had a loss of grip in both hands. On several occasions he dropped glasses and teacups due to the weakness in his arms and hands. Finally, he testified that he was unable to sit, stand, or walk for any appreciable period of time and had to alternate between these activities and lying down. The petitioner's wife testified that she helped the petitioner dress and undress.

The record also shows that the arbitrator specifically found the testimony of both the petitioner and his wife to be believable and credible. In addition, it shows that no evidence was presented by the respondent disputing the petitioner's testimony that the two incidents in question occurred.

The medical records regarding the two incidents show that Dr. Marrese was the petitioner's treating physician since 1984. The records also show that the petitioner underwent cervical surgery on August 13, 1986. In addition, he had surgery performed on his lower back in January of 1987, and again in November of 1988. All of the surgeries were performed by Dr. Marrese.

Dr. Marrese testified that based upon the various clinical studies, tests, myelograms, CT scans, a discography, and actual observation during surgery, the injuries of which the petitioner complained were confirmed. Furthermore, in his opinion the petitioner's disability was causally related to the injuries he suffered in 1984 and 1986 and particularly related to the injuries he suffered on July 11, 1986.

Regarding the cervical surgery, Dr. Marrese testified that the surgery consisted of a microscopic anterior cervical discectomy and interbody fusion at C4-5 and C5-6, with removal of posterior osteophytes and bone spurs from both those levels. In his opinion, the disc material was herniated and the nerve root was compressed. It was also his opinion that the surgery was necessary to both relieve the petitioner's pain and to prevent the risk of cord damage during low back surgery.

Dr. David Lange testified on behalf of the respondent regarding the petitioner's cervical injury. He stated that he had examined the petitioner on one occasion about three weeks after the July incident. At that time the petitioner did not appear to be in any distress.

Thereafter, he examined all the radiographic and hospital records. He testified that the petitioner had a degenerative disc between the fifth and sixth cervical vertebrae and degenerative changes at C6-7. Further, he found that a cervical myelogram showed a decreased filling of the C6 nerve roots. He stated that the petitioner's complaints, if related to nerve root involvement, would correspond to the C7 or C8 nerve root, not the C6 nerve root. As such, he did not think surgery was warranted to fuse the part of the cervical spine that Dr. Marrese had fused.

On cross-examination, he testified that the petitioner's complaint of bilateral weakness of grip could be the result of an injury to the cervical area. He also stated that if a disc or an osteophyte protrudes centrally, it could cause problems at a nerve root that comes out at a lower level. Finally, he stated that a significant neurological compression would be indicated if there was a diminished reflex and grip of both hands, and that a treating doctor who is aware of his patient's complaints is in the best position to assess the need for surgery.

Dr. Alan Froehling also testified on behalf of the respondent. He examined the medical records and found only a mild impression on the thecal sac at C5-6. He also found some bony spur formation and thinning of the disc at C5-6, suggesting a degenerative change at that level. He was unable to say with any certainty that there was any nerve root compression. In his opinion, there was no urgent need for cervical surgery.

However, he admitted that the X rays confirmed that the petitioner had evidence of degenerative disc disease. He also admitted that a central disc herniation at C5-6 could very well give symptoms of a nerve root injury at a lower cervical level. Furthermore,

he testified that the respondent had not furnished him with the CT scans of the C5-6 and C6-7 levels until the day of his deposition, and that such information would have been helpful to him in reaching a diagnosis. Finally, he concluded that the stabbing pain in the petitioner's arms was consistent with a cervical disc injury.

Regarding the petitioner's first back surgery, Dr. Marrese testified that he first saw the petitioner on June 18, 1984, following the incident in March of 1984. At that time, the petitioner told him that he had injured his back while attempting to lift a bucket at work. He stated that he performed a lumbar thermogram on the petitioner and that the results of that test corroborated the petitioner's complaints of numbness in his lower back. Thereafter, he ordered the petitioner to undergo a CT scan and an EMG test.

Dr. Marrese testified that the results of these tests showed spinal stenosis and disc herniation at L4-L5. Radiologist Vest viewed the CT scan and found a bulging disc at L5-S1 with bilateral foramen stenosis, and mild bulging of the disc at L4-L5. Dr. Chomirun, an electromyographer, viewed the EMG test and found bilateral radiculopathy at L5 and S1. The petitioner continued conservative treatment with Dr. Marrese throughout 1984 and 1985. In May of 1986, Marrese ordered another thermogram and found nerve defects along the L5 and S1 dermatomes.

Thereafter, the petitioner suffered an injury at work on July 11, 1986. He was taken to Wood River Township Hospital and treated by Dr. Marrese for arm burns and back and neck injuries. Marrese testified that he ordered a lumbar CT scan, which showed projection of the L5-S1 disc into the neural foramen with lateral recessed stenosis. In August of 1986, he also had the petitioner undergo a lumbar discogram, which showed dye escaping from the confines of L4-5. He stated that this was abnormal.

Dr. Marrese testified that he readmitted the petitioner to Wood River on January 27, 1987, and performed a bilateral partial laminectomy on him at L4-5 and an excision of the herniated disc at the same level. Following this surgery, the petitioner began to experience some relief from the pain in his back. Marrese also testified that the July 11, 1986, incident aggravated the petitioner's lower back condition.

Both Drs. Lange and Froehling were of the opinion that the back surgery performed in January of 1986 was not necessary at that time. However, Dr. Lange admitted that some of the tests indicated that there could very well be a lateral herniation at L4-5. In addition, he felt that the petitioner's problems were most severe at

L4-5. Furthermore, he stated that based on his single examination in August of 1986, he would not have concluded that the petitioner's condition was stable. Finally, he testified that degenerative discs can be aggravated as a result of trauma.

Dr. Froehling admitted that the petitioner's pain in his lower back was consistent with a bilateral lumbar disc injury. Furthermore, he testified that some of the test results could indicate that the petitioner had a herniated disc, which could have been aggravated by trauma.

Regarding the surgery in November of 1988, the evidence showed that in October of 1988, without any intervening injury, the petitioner suffered sharp pains in his back. He went to Dr. Marrese, who ordered a myelography, the results of which showed further herniation at L4-5 and a slight bulge at L3-4 and L5-S1. Prior to surgical intervention, an attempt was made to use lumbar epidural blocks, which failed to relieve the petitioner's pain.

Thereafter, the petitioner underwent a reexcision of a recurring herniation of the disc at L4-5, with fusion. Dr. Marrese testified that ruptured discs can and do reherniate without any particular sort of stress. Dr. Froehling agreed that such discs can reherniate without any intervening cause.

From the foregoing, the arbitrator found that the petitioner had sustained injuries arising out of and in the course of his employment on April 17, 1984, and July 11, 1986. He awarded the petitioner $135^{2/7}$ weeks of TTD benefits and $50,000 in medical expenses. The Industrial Commission affirmed the arbitrator's decision. The circuit court confirmed the Commission's decision.

The respondent first argues on appeal that the Commission erred in finding that the medical care provided by Dr. Marrese was necessary for the treatment of the petitioner's injuries. Specifically, it contends that the cervical and lumbar surgeries were unnecessary.

Under the Workers' Compensation Act, a respondent may only be ordered to pay for treatment which was reasonably required to cure or relieve the petitioner of the effects of his injury. (*Quality Wood Products Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 417, 454 N.E.2d 668.) It is the Commission's function to resolve disputed questions of fact, to draw permissible inferences and to decide which of conflicting medical views is to be accepted. In the presence of conflicting medical opinions, the Commission's determination is given substantial deference and will be upheld unless it is

contrary to the manifest weight of the evidence. *Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.

■ Here, the Commission found that the surgeries performed on the petitioner were necessary to relieve him of the effects of his injuries. The record showed that at the time of the cervical surgery, the petitioner was still suffering from back pain caused by the 1984 incident and that his back condition was not getting any better through the use of conservative treatment. In addition, he was suffering from pain in his neck and a loss of grip in both hands. Therefore, Dr. Marrese concluded that the cervical surgery was necessary to relieve the petitioner's pain and to prevent the risk of cord damage during low back surgery.

Marrese also concluded that the lumbar surgeries were necessary to relieve the petitioner's pain. The petitioner suffered from a herniated disc, and the long-term use (1984-1986) of conservative treatment was not correcting or relieving the problem. As such, in Dr. Marrese's opinion surgery was needed to help the petitioner. Regarding the second surgery, he stated that it was necessary to repair a reherniated disc.

Although two other doctors gave conflicting medical opinions as to the need for the surgeries, this merely created questions of fact best left to the determination of the Commission. Based on the evidence, we find that the Commission's decision was not against the manifest weight of the evidence.

The respondent next argues that the Commission erred in finding a causal relationship between the petitioner's condition and any work accident. Specifically, it contends that no evidence was presented showing that the second lumbar surgery was causally related to the petitioner's claimed work injuries. In addition, it argues that since the first two surgeries were unnecessary, the petitioner's condition which resulted from the surgeries cannot be said to be causally related to any work injuries.

For an injury to arise out of one's employment, the injury must have an origin in some risk connected with or incidental to the employment so that there is a causal connection between the employment and the injury. (*Fire King Oil Co. v. Industrial Comm'n* (1976), 62 Ill. 2d 293, 342 N.E.2d 1.) The Commission's findings will not be reversed on appeal unless they are contrary to the manifest weight of the evidence. *Glover v. Industrial Comm'n* (1985), 140 Ill. App. 3d 361, 485 N.E.2d 605.

■ Here, the petitioner testified that he was injured while working on both April 17, 1984, and July 11, 1986. No evidence

was presented disputing the fact that the incidents occurred and that the petitioner suffered injuries as a result of the incidents. Instead, the respondent disputes the causal connection between the surgeries performed to help correct the problems associated with the injuries and any work-related incident.

■ Regarding the respondent's claim that no causal connection existed between the second lumbar surgery and a work-related incident, we note that the evidence does not support its contention. Here, the petitioner suffered from a recurring herniation of the disc at L4-5. Both Drs. Marrese and Froehling testified that previously ruptured discs can and do reherniate without any particular sort of stress.

Based on this evidence, the Commission found that the petitioner had shown a causal connection between work-related injuries and the need for further surgery to correct all the effects of those injuries. We hold that the Commission's finding on this fact was not against the manifest weight of the evidence.

Regarding the respondent's claim that no causal connection existed between the need for the other two surgeries and a work-related injury, we note, as previously discussed, that the evidence supports the finding that the surgeries performed on the petitioner were necessary to help his condition. In addition, Dr. Marrese testified that the petitioner's disability was causally related to the injuries he suffered while working for the respondent.

Once again, even though conflicting medical evidence was presented disputing Marrese's opinion as to the need for the first two surgeries, we find that this merely raised questions of fact best left to the determination of the Commission. Based on the record, we find that the Commission's decision was not against the manifest weight of the evidence.

Next, the respondent argues that Marrese's charges for his services were unreasonable. Specifically, it contends that his charges were substantially higher than the usual and customary charges for the same surgical procedures in the Mt. Vernon area.

■ We note that this issue appears to be one of first impression. However, we find support for the respondent's position regarding the use of a reasonableness standard, in section 8(a) of the Act: "The employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, *limited, however, to that which is reasonably required* to cure or relieve from the ef-

fects of the accidental injury." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 48, par. 138.8(a).

Further, analogous support is found in *Mathieu v. Venture Stores, Inc.* (1986), 144 Ill. App. 3d 783, 494 N.E.2d 806. We note that while *Mathieu* is not directly on point, since it dealt with the Illinois Structural Work Act, it nonetheless is helpful. In that case, the court set out the following jury instruction to be used on the issue of damages: "The reasonable expense of necessary medical care, treatment, and services received ***." 144 Ill. App. 3d at 798.

Additional support for this standard can be found in *Protestant Hospital Builders Club v. Goedde* (1981), 98 Ill. App. 3d 1028, 424 N.E.2d 1302, where the court held that in Illinois, when there is a contract, express or implied, under which one party supplies services to another and there is no provision setting out the amount the supplier is to be compensated, the law implies that there is an agreement to pay a reasonable price for the services.

As such, we find that the Act and the above-cited case law indicate that a standard of reasonableness should be applied to issues regarding the amount a respondent is required to pay for medical expenses. This brings us to the next issue of what standard should be applied in determining what is reasonable.

We find that the proper standard is that which is usual and customary for similar services in the community where the services were rendered. Although there are no cases on point, we find support for this position in *Sullivan v. Fawver* (1965), 58 Ill. App. 2d 37, 206 N.E.2d 492. There, the court held that when the parties have no explicit agreement concerning the amount to be charged for services, the law implies that the amount shall be what is usual and customary for similar services in the same community.

In the case at hand, the Commission found that while other doctors' charges were somewhat lower, there was no clear evidence that Dr. Marrese's charges were unreasonable. The record showed that during the relevant period involved in this case, Marrese practiced in Evansville, Indiana, and Wood River, Illinois. It also showed that Marrese charged $5,500 for the cervical surgery, $3,375 for the first lumbar surgery, and $4,670 for the second lumbar surgery. Marrese testified that all of his charges were reasonable. We note that no evidence was introduced showing that Marrese's charges were unreasonable with respect to what other surgeons in Evansville, Indiana, and Wood River, Illinois, would have charged. As

such, we find that the Commission's decision was not against the manifest weight of the evidence.

The respondent next argues that the Commission erred in awarding $1,588 in travel expenses to the petitioner. Specifically, it contends that the petitioner failed to show the "reasonable necessity" of traveling outside the Mt. Vernon area for medical treatment since such treatment was available in Mt. Vernon.

█ We note that this issue also appears to be one of first impression. However, we find that the same reasonableness standard set forth above applies here.

The record shows that the petitioner lived in the Mt. Vernon area and sought treatment from Dr. Marrese, who practiced first in Evansville, Indiana, and then in Wood River, Illinois. Evansville is approximately 100 miles from the petitioner's home and Wood River is approximately 90 miles away. The record also shows that Marrese had been the petitioner's treating physician since 1984.

The Commission found that it was reasonably necessary for the petitioner to travel to and from Dr. Marrese's office and to and from the Wood River Hospital. As such, it included $1,588 in the petitioner's medical expenses award for travel. We find that the Commission's decision was not against the manifest weight of the evidence.

The evidence showed that Marrese was the petitioner's treating physician since 1984. As such, he was the doctor most familiar with the petitioner's condition and medical history. It would seem to be only reasonable for the petitioner to seek the medical care of someone he knew and trusted. In addition, while the evidence showed that Dr. Froehling was an orthopedic surgeon in the area, no evidence was presented showing that there were any other such surgeons in the area. Given Froehling's testimony that surgery was not necessary in this case, we find that it was reasonable for the petitioner to seek the treatment of someone who was willing to perform surgery to relieve his pain.

The respondent next argues that the Commission erred in its determination of the petitioner's average weekly wage. The Commission found that the petitioner had been disabled since July of 1986 and awarded him $532.22 per week for that period. It specifically found that vacation pay was to be included in determining the average weekly wage. The respondent argues that the petitioner is not entitled to $532.22 a week due to the fact that the Commission erroneously included vacation and overtime pay in its calculation.

■ The record shows that the parties agreed that the petitioner's average weekly wage, including vacation time, was $517.73. This calculation excluded overtime pay. The Commission nonetheless found that the petitioner's average weekly wage was $532.22. This was based on its finding that the petitioner's yearly income was $27,675.30. The Commission then divided that amount by 52 and arrived at its figure. However, the evidence also showed that the $27,675.30 figure included overtime and vacation pay.

The basis for computing the compensation provided for in the Act shall be as follows: "The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52 ***." Ill. Rev. Stat. 1989, ch. 48, par. 138.10.

In the case at hand, we hold that the Commission's finding that the petitioner's average weekly wage was $532.22 was against the manifest weight of the evidence. The evidence showed that the $27,675.30 figure included overtime pay. However, the Act clearly prohibits this pay from being included in the calculation of an employee's average weekly wage.

Regarding the respondent's contention that vacation pay should also be excluded from the calculation, we note that the respondent has failed to cite any case law supporting its position.

As such, we find that vacation pay should be included as part of an employee's average weekly wage. While the Act does not exclude vacation pay, it does specifically exclude overtime pay. Therefore, it can be inferred that if the legislature intended to exclude vacation pay it would have specifically excluded it. In addition, we note there is no contention this case involves a duplication of pay inasmuch as the parties agree the employee did not work during his vacation period.

Accordingly, we hold that the Commission's finding that vacation pay should be included was not erroneous. However, the Commission's calculation was erroneous since it included overtime pay. We therefore reduce the average weekly wage to $517.73, that being the amount the parties agreed was the average weekly wage when vacation pay was included.

On cross-appeal, the petitioner argues that he is entitled to penalty damages due to the respondent's bad faith in carrying on pro-

ceedings which did not present a real controversy and due to its failure to pay him TTD benefits. The record shows that the petitioner argued before the arbitrator, the Commission, and the circuit court that the respondent should be subject to penalties for its delay in paying him TTD.

The arbitrator denied his claim, finding that there was sufficient diversity of medical opinions to justify the respondent's delay in paying benefits. The Commission affirmed the arbitrator's decision, and the circuit court confirmed the Commission's decision.

In cases where there has been any unreasonable or vexatious delay of payment or intentional underpayment of compensation, or proceedings have been instituted or carried on by the one liable to pay the compensation which do not present a real controversy but are merely frivolous or for delay, the Commission may award compensation additional to that otherwise payable under the Act. (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(k).) However, the courts have refused to assess penalties under this section where the evidence indicates the employer reasonably could have believed that the employee was not entitled to the withheld compensation. The standard an employer is held to is one of objective reasonableness in its belief. That is, the facts must show that a reasonable person in the employer's position would believe that the employee was not entitled to the benefits. *Board of Education v. Industrial Comm'n* (1982), 93 Ill. 2d 1, 442 N.E.2d 861.

■ In the case at hand, we find that the Commission did not abuse its discretion when it denied the petitioner's request for penalties. The record shows that the medical evidence in this case was conflicting. As such, a reasonable person in the respondent's position could have believed that the petitioner was not entitled to the withheld benefits.

The judgment of the circuit court of Jefferson County is affirmed as modified, and the cause is remanded to the Commission with directions to enter an order amending its decision, to reflect petitioner's correct average weekly wage of $517.73.

Affirmed as modified and remanded.

McCULLOUGH, P.J., and WOODWARD, LEWIS, and RAKOWSKI, JJ., concur.