DONALD G. PLUTO, JR., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (T.R. Hess Construction, Appellee).

First District (Industrial Commission Division)   No. 1—94—1776WC

Opinion filed May 12, 1995.

Anesi, Ozmon & Rodin, Ltd., of Chicago (Richard A. Kimnach and Michelle L. DeKalb, of counsel), for appellant.

Wiedner & McAuliffe, Ltd., of Chicago (Frank J. Wiedner and Mark P. Matranga, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Donald Pluto, Jr. (claimant), filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.* (now 820 ILCS 305/1 *et seq.* (West 1992))) alleging that he sustained an accidental injury arising out of and in the course of his employment with T.R. Hess Construction (employer). The arbitrator awarded the claimant 110³/₇ weeks of temporary total disability (TTD) benefits at $540.53 per week for the period of February 16, 1989, through March 31, 1991. For the purpose of calculating a wage differential award under section 8(d)(1), the arbitrator found that the claimant's average weekly wage was $810.80. The arbitrator rejected the payment of medical bills from Northwest Indiana Neurodiagnostics in the amount of $2,650 and Methodist Hospital in the amount of $734. The arbitrator further found that the claimant was unable to perform his usual and customary employment and awarded the claimant $282.40 per week for the duration of his disability pursuant to section 8(d)(1) of the Act. The arbitrator denied the award of penalties pursuant to section 19(l) of the Act. The Illinois Industrial Commission (Commission) affirmed the arbitrator's award and on administrative review, the Commission's decision was confirmed by the circuit court. The issues raised on appeal are: (1) whether the calculation by the Commission of the wage differential award pursuant to section 8(d)(1) of the Act was in accordance with the law; (2) whether the denial of payment of a portion of the medical expenses was consistent with section 8(a) of the Act; (3) whether the determination of the Commission that the claimant was not entitled to penalties pursuant to section 19(l) is against the manifest weight of the evidence; and (4) whether the Commission's findings that the claimant was engaged in suitable post-occurrence employment is supported by the evidence. For the reasons which follow, we affirm.

The claimant was employed as an ironworker on February 16, 1989, when he fell and landed on his left foot and buttocks. He received emergency treatment on the day of the accident and also saw his physician, Dr. Jones, who referred him to Dr. Patel, a surgeon. Dr. Patel performed surgery to the left foot to repair fractures of the second, third, and fourth metatarsals.

The claimant also sought treatment from Dr. Kostidis, a chiropractor, for back pain. Dr. Kostidis had treated the claimant for pain in his neck, upper and lower back prior to the accident. Follow-

ing the accident, the claimant's back pain increased due to his limping and walking with crutches.

The claimant remained under the care of Drs. Patel and Kostidis throughout 1989. As of October 23, 1989, Dr. Patel concluded that the fractures were healed and he advised the claimant to engage in progressive activity and return to work. The claimant did return to work for a few days but experienced stiffness, pain and instability of his foot. He returned to Dr. Patel and began physical therapy treatments. The claimant also saw Dr. Mitsos on January 24, 1990, who concluded that the claimant's injuries were healed but that there might be a psychological component to his complaints. On March 24, 1990, the claimant saw Dr. Farrales, who diagnosed the claimant as having a post-traumatic stress disorder and recommended a work-hardening program.

The claimant began the work-hardening program at STEPS in April 1990. During the program he experienced pain in his foot, ankle, and back. The claimant returned to Dr. Kostidis and Dr. Jones for treatment of his back pain. The claimant completed the work-hardening program on May 18, 1990. Although the claimant was classified as being able to do heavy work, ironworking was considered very heavy work. Therefore, it was recommended that the claimant undergo vocational retraining to find suitable employment up to the heavy work level.

The claimant met with Beth Healy from Rehabilitation Management and began on-the-job training with Werner-Herbison-Pagett on September 20, 1990. On April 1, 1991, he began working for the company as a construction consultant and estimator at a starting salary of $400 per week.

Dr. Shermer examined the claimant on January 28, 1991, on behalf of the employer and concluded that the claimant's metatarsal fractures were healed and well aligned. His further findings were that there was excellent stability and function of the foot with the exception of minimal restriction of the ankle joint with plantar flexion and eversion. There was also a mild flexion restriction of the second and third digits due to the surgical scar. Dr. Shermer concluded that the claimant was able to return to his former position as an ironworker. Dr. Patel saw the claimant on February 28, 1991, and also concluded that he could return to work but that he should start with a low level of work and progress very slowly.

The claimant saw Dr. Sommer, a podiatrist, who recommended orthotics and an ankle brace. On August 12, 1991, the claimant was examined by Dr. Pahwa, on behalf of respondent. Dr. Pahwa concluded that the claimant's foot and ankle were stable with some

loss of inversion and swelling over the forefoot and second toe. He was also of the opinion that the claimant could resume work as an ironworker.

In September 1991 the claimant sought treatment from Dr. Wojnaroski, who referred him to Dr. Mylos. Dr. Mylos recommended an EMG and a NCV which was performed by Dr. Amico. At his attorney's request, the claimant was also examined by Dr. Coe. Dr. Coe was of the opinion that the claimant was unable to return to his position as an ironworker.

The claimant was paid TTD benefits through January 28, 1991, which was the date that the employer's physician, Dr. Shermer, concluded that the claimant could return to work. Thereafter, an advance against permanent partial disability (PPD) of $4,859.41 was made to resolve a dispute over TTD benefits from January until April 1991 when the claimant began work at Werner-Herbison-Pagett. There had also been an underpayment of weekly TTD benefits prior to January 1991 which was corrected by the employer. The parties stipulated to the average weekly wage at arbitration.

I

■ The claimant contends that the Commission's calculation of the wage differential award pursuant to section 8(d)(1) of the Act was contrary to law because it did not include fringe benefits. The cardinal rule of statutory construction is to give effect to the legislative intent of the enactment. (*Rushton v. O'Malley* (1980), 89 Ill. App. 3d 103, 104, 411 N.E.2d 528.) The legislative intent is determined by looking to the words of the statute since the legislature is presumed to have intended what it said. (*Rushton*, 89 Ill. App. 3d at 104.) "In construing a statute, the language should be given its plain and ordinary meaning." (*Village of East Galesburg v. Ennis* (1989), 190 Ill. App. 3d 112, 114, 545 N.E.2d 1375.) Furthermore, different sections of the same statute should be considered as *in pari materia* and should be construed so as to avoid an illogical result. (*Goodson v. Industrial Comm'n* (1989), 190 Ill. App. 3d 16, 18, 545 N.E.2d 975.) In computing a wage differential award, section 8(d)(1) must be read in conjunction with section 8(b)(2), which provides in relevant part:

"The compensation rate in all cases other than for temporary total disability under this paragraph (b) *** of this Section shall be equal to 66²/₃% of the employee's average weekly wage computed in accordance with the provisions of Section 10 ***." (820 ILCS 305/8(b)(2) (West 1992).)

Section 10 of the Act provides in relevant part:

"The basis for computing the compensation provided for in Sections 7 and 8 of the Act shall be as follows:

The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52 ***." (820 ILCS 305/10 (West 1992).)

According to Webster's Ninth New Collegiate Dictionary, "actual" is defined as "existing in fact and not merely potentially" or "existing or occurring at the time." (Webster's Ninth New Collegiate Dictionary 54 (1988).) "Earnings" has been defined as "something (as wages) earned." (Webster's Ninth New Collegiate Dictionary 392 (1988).) "Wages" has been defined as "a payment of money for labor or services." (Webster's Ninth New Collegiate Dictionary 1324 (1988).) These definitions indicate that the plain, ordinary meaning of section 10 of the Act provides that the average weekly wage shall reflect the payment of wages for labor or services during the 52 weeks preceding the injury.

The claimant maintains that certain fringe benefits should have been included in the calculation of his average weekly wage. The fringe benefits in this case consist of contributions the employer made into certain funds based on the number of hours the claimant and other ironworkers worked. According to the claimant's brief, the contributions by the employer on behalf of each ironworker consisted of $3.45 per hour to health and welfare, $1,945 to the pension fund and $5 per hour toward the annuity fund.

█ The leading case on whether the average weekly wage includes fringe benefits is *Morrison-Knudsen Construction Co. v. Director, Office Workers' Compensation Programs, United States Department of Labor* (1983), 461 U.S. 624, 76 L. Ed. 2d 194, 103 S. Ct. 2045, in which the Supreme Court held that an employer's contributions to union trust funds for health and welfare, pensions, and training were not considered wages for the purpose of calculating benefits under the District of Columbia Workers' Compensation Act. In *Morrison-Knudsen Construction Co.*, the relevant statutory provision stated that " ' "[w]ages" means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer and gratuities received in the course of employment from others than the employer.' " (461 U.S. at 629, 76 L. Ed. 2d at 199, 103 S. Ct. at 2048, quoting 33 U.S.C. § 902(13) (1982).) The Supreme Court held that the plain language of the Act could not be read to consider these contribu-

tions (fringe benefits) as the money rate or gratuities, nor could the fringe benefits be considered as board and lodging because such items have a value which could readily be converted into a cash equivalent. Contributions to the health and welfare and pension funds, however, could not be readily converted into a cash equivalent. Furthermore, the Court noted that there was no direct correlation between the size of the contributions and the size of the benefits an employee could receive.

According to Professor Larson, the Supreme Court's view represents the majority position on fringe benefits. Larson further observes that "wage" means "the wages that a worker lives on and not miscellaneous values that may or may not someday have a value to him depending on a number of uncontrollable contingencies." 2 A. Larson, Workmen's Compensation § 60.12(b), at 10—665 (1992).

In *Ragland v. Morrison-Knudsen Co.* (Alaska 1986), 724 P.2d 519, the Alaska Supreme Court included fringe benefits in the definition of wages. However as distinguished from *Morrison-Knudsen Construction Co. v. Director, Office Workers' Compensation Programs,* the total hourly wage negotiated by the union in *Ragland* was divided between cash payments and fringe benefits based on the vote of the members as to how the total wage was to be divided. Jurisdictions outside of Illinois with comparable statutory provisions have also refused to include contributions to fringe benefits plans in determining an employee's average weekly wage. See *Linton v. City of Great Falls* (1988), 230 Mont. 122, 749 P.2d 55; *Gajan v. Bradlick Co.* (1987), 4 Va. App. 213, 355 S.E.2d 899; *Nelson v. SAIF Corp.* (1987), 302 Or. 463, 731 P.2d 429.

Although not binding on this court, the Commission has determined that fringe benefits are not included in the calculation of the average weekly wage on other occasions. In *Graham v. Transport Motor Express* (1981), No. 81—IIC—761, the Commission determined that payment made by the employer to the union health and welfare program was not compensation because it was paid directly by the employer and not deducted from the claimant's earnings. In *Luparell v. Maco Construction* (1989), No. 89—IIC—898, a similar determination was made.

An additional point is that the inclusion of fringe benefits in the calculation of the average weekly wage could work to the claimant's disadvantage and not accomplish the purpose of section 8(d)(1) where the actual earnings of the post-accident employment are less than the original employment but the fringe benefits are significantly greater. Under these facts, the claimant would not receive an adjustment in the wage rate under section 8(d)(1) and would not receive

any additional wages as a result of the greater fringe benefits. We also note that fringe benefits are not included as earnings or income for State or Federal income tax purposes. However, vacation is included as earnings or income where an employee is paid his regular earnings during the time he takes time off for vacation. This fact distinguishes fringe benefits from vacation pay which is included in the calculation of an employee's average weekly wage. See *General Tire & Rubber Co. v. Industrial Comm'n* (1991), 221 Ill. App. 3d 641, 582 N.E.2d 744.

For the aforementioned reasons, we conclude that the Commission's calculation of the claimant's average weekly wage exclusive of fringe benefits was correct.

## II

The claimant next contends that the Commission erred in finding that the medical bills of Northwest Indiana Neurodiagnostics and Methodist Hospital were beyond the two-physician chain of referral allowed under section 8(a) of the Act. Section 8(a) provides that the employer's liability to pay for medical services selected by the employee shall be limited to emergency medical and surgical as well as hospital, medical, and surgical services provided by the physician initially chosen by the employee or any other provider of service recommended by the initial service provider or any subsequent provider of medical services in the chain of referrals from said initial service provider. The statute also provides that the employer will pay for the same medical services or referrals of the claimant's second choice of a physician.

■ In this case the claimant sustained an injury to his low back as well as his left foot as a result of his accident on February 16, 1989. The Commission determined that the claimant's first choice of a physician was his family physician, Dr. Jones, who referred him to Dr. Patel, and that his second choice of physician was Dr. Kostidis. Therefore, the care provided by Drs. Sommer, Wojnaroski, Mylos, and Amico was outside the chain of referrals allowed under section 8(a) of the Act. The claimant argues that the bills of Dr. Amico and Methodist Hospital should be allowed because he did not seek payment for the bills of Drs. Sommer or Kostidis. In essence, the claimant argues that he should be able to choose which of the physicians are to be considered his first and second physician choice. While this may be allowed in some cases, there is no compelling reason to deviate from the two-physician rule in this case.

In *Wolfe v. Industrial Comm'n* (1985), 138 Ill. App. 3d 680, 486 N.E.2d 280, the court held that the employee was not entitled to

reimbursement for a subsequent choice of physician even though his second choice had been a single visit to an emergency room where his initial physician choice was allegedly unavailable. The court held that the employee failed to provide evidence that the visit to the emergency room physician was necessary and that his initial choice physician was unavailable. Similarly, in the case *sub judice*, the claimant has not presented evidence that Dr. Patel or Dr. Kostidis was unavailable or unable to refer the claimant to providers who could provide the necessary treatment. We further note that, under the claimant's theory, an employee could seek treatment from a number of doctors and submit the bills of those providers which were for the greatest amount. Thus, because the bills for which the claimant seeks reimbursement are from those providers who represent the claimant's fourth and fifth choice, the Commission's denial of these medical expenses was consistent with the statute.

## III

The claimant further contends that he was entitled to penalties pursuant to section 19(1) because the employer failed to meet its burden of justifying its delay in paying full TTD benefits. Pursuant to this provision, the claimant is entitled to an additional payment of $10 per day for each day that weekly compensation benefits were withheld or refused. However, this compensation is only payable where the employer or his insurance carrier shall, without good cause, fail, neglect, refuse or unreasonably delay the payment of weekly compensation benefits during the period of TTD. Section 19(1) does not provide for the imposition of penalties where there has been an unintentional partial underpayment of compensation or where the employer has acted in reliance on qualified medical opinion. The question of whether the employer has unreasonably delayed payment is one of fact, and as with other fact questions, findings of the Commission will not be disturbed unless they are against the manifest weight of the evidence. *Christman v. Industrial Comm'n* (1989), 180 Ill. App. 3d 876, 884, 536 N.E.2d 773.

■ The basis of the claimant's contention that he is entitled to penalties relates to the alleged underpayment of TTD due to a dispute over the amount of claimant's average weekly wage and a subsequent question as to when the claimant was able to return to work. The average weekly wage dispute was resolved prior to arbitration and the claimant's filing of his petition for penalties. The claimant also argues that he was not paid the full amount of TTD because he received no benefits between January 28, 1991, and April 1, 1991. The employer withheld payments during this period based on Dr. Sher-

mer's evaluation that the claimant was able to return to work. Dr. Patel released the claimant to return to work on February 28, 1991. Although the employer did not pay TTD benefits during the two-month period between January and April, it did pay an advance against PPD in the amount of $4,859.41. These facts support the Commission's determination that the employer did not act without good cause and did not unreasonably delay compensation payments. Therefore, its determination that the claimant was not entitled to the award of penalties was not against the manifest weight of the evidence.

## IV

The claimant's final contention is that he is not engaged in suitable employment, that the award of benefits under section 8(d)(1) is premature, and that the vocational rehabilitation should be resumed. The Commission concluded that the award of benefits under section 8(d)(1) was indicated based on evidence that the claimant was unable to return to his former occupation as a journeyman ironworker. The evidence considered by the Commission was the fact that the claimant had sustained a serious injury to his left foot and an aggravation of his preexisting back problems. After surgery and rehabilitation, the claimant tried to return to his former position but was unable to perform the work. He returned to his treating surgeon, Dr. Patel, and also saw Drs. Mitsos and Farrales. Dr. Farrales referred the claimant to a work-hardening program (STEPS) which he attended for approximately one month. The claimant was discharged from the program at that time after meeting the identified goals of the program, and he was placed in a vocational rehabilitation program through which he was subsequently employed by Werner-Herbison-Pagett. However, because the claimant's income was reduced following his injury, he was awarded $282.40 in PPD benefits pursuant to section 8(d)(1) of the Act for the duration of his disability.

The claimant's argument that his current employment is unsuitable is that it is geographically inconvenient, a lower salary than expected and without fringe benefits and that he was laid off for five weeks. However, because the claimant's current employment is not the most desirable does not mean that further vocational rehabilitation is indicated or that the award of benefits under section 8(d)(1) was premature. The claimant has also presented no evidence and advances no argument that he is unable to perform his current job. Therefore, we conclude that the Commission's determination that the claimant found suitable post-occurrence employment and was eligible for section 8(d)(1) benefits is not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court confirming the determination of the Commission is affirmed.

Affirmed.

McCULLOUGH, P.J., and COLWELL, McCUSKEY, and RARICK, JJ., concur.