LANTER COURIER, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Kay Whitis, Appellee).

Fifth District (Industrial Commission Division)    No. 5—95—0367WC

Opinion filed June 20, 1996.—Rehearing denied August 2, 1996.

2

RARICK, J., concurring in part and dissenting in part.

David J. Reynolds, of Evans & Dixon, of St. Louis, Missouri, for appellant.

Gregory S. Keltner, of Bono, Goldenberg, Hopkins & Bilbrey, P.C., of Wood River, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Respondent employer Lanter Courier appeals from an order of the circuit court of Madison County reversing in part and confirming in part the decision of the Illinois Industrial Commission (Commission). The Commission awarded claimant Kay Whitis $115.04 per week for 257.5 weeks for temporary total disability (TTD), $4,576.33 for reasonable and necessary medical expenses, and $103.53 per week

for 225 weeks for permanent partial disability (PPD) to the extent of 45% of the person as a whole. See 820 ILCS 305/8(a), (b), (d)(2) (West 1994). The arbitrator had awarded claimant TTD at the rate of $118.86 for 257.5 weeks, $45,493.54 for medical expenses, and $207.85 per week for life for permanent total disability (PTD) (820 ILCS 305/ 8(f) (West 1994)). According to the circuit court, (1) the Commission's finding that claimant was not permanently totally disabled was against the manifest weight of the evidence and (2) the Commission's determination that claimant exceeded her choice of physicians under section 8(a) of the Workers' Compensation Act (Act) (820 ILCS 305/ 8(a) (West 1994)) was contrary to law and against the manifest weight of the evidence. The circuit court modified the Commission's award to require respondent to pay $45,505.33 in medical expenses.

On appeal, the issues are whether (1) the Commission's finding that claimant was entitled to PPD benefits and not PTD benefits was against the manifest weight of the evidence and (2) the Commission's finding that claimant had exceeded her choices of medical providers was incorrect as a matter of law or was against the manifest weight of the evidence. We reverse the circuit court to the extent it found that the Commission award of PPD was against the manifest weight of the evidence and affirm in all other respects. Only those facts necessary to an understanding of this disposition will be discussed.

Claimant, a then-41-year-old courier with a ninth-grade education, was injured on January 19, 1988, while carrying suitcases up stairs. Claimant's family physician, Dr. Muhammad Jamil, initially diagnosed an acute strain of the lower back with no neurological abnormalities. Claimant began treatment with Dr. R. Anthony Marrese, an orthopedic surgeon, on November 2, 1989. Marrese diagnosed a disk herniation at L4-L5. He performed a percutaneous lumbar nucleoectomy on November 16, 1989, and a bilateral partial laminectomy, with excision of the persistent disc herniation and interbody fusion, on November 14, 1991. Marrese testified on May 1, 1992, that (1) he expected claimant would continue to be temporarily totally disabled for 10 weeks, (2) she had some permanent impairment, and (3) he estimated lifting restrictions of carrying over 40 pounds and restrictions as to reaching, pulling, and climbing. In a February 5, 1993, report, he stated claimant would have permanent impairment. Her restrictions precluded repeated lifting, bending, stooping, and squatting, and she had a 20-pound weight restriction. He noted that her range of motion in the lumbar spine was reduced, and she would have to take nonsteroid anti-inflammatory medication on a permanent basis. On March 2, 1993, Marrese indicated claimant was not physically capable of performing her prior occupational duties.

4

At the request of respondent, claimant was examined by orthopedic surgeons Dr. Sherwyn Wayne on April 29, 1988, March 9, 1990, February 18, 1991, and July 24, 1991, and Dr. Bernard C. Randolph on September 30, 1993. Wayne testified that claimant showed no indication for work restrictions and was capable of working. Randolph was of the opinion that claimant was capable of performing work of a sedentary or light-duty nature. He stated claimant should avoid lifting more than 20 pounds and repetitive flexion, extension, and twisting of the lumbar spine. According to Randolph, her ideal job would allow intervals of sitting and standing during the day. He felt she could probably work as a cashier, assembler of small products, ticket seller, or clerk. Wayne and Randolph both indicated claimant had reached her maximum medical improvement.

Claimant testified she was released for light-duty work by Marrese on March 2, 1993, and that she could perform light-duty work. She stated that in May 1989, she had attempted to return to part-time work with respondent, but her pain increased. From June 1989 to August 1989, she received job counseling and placement services from respondent. She applied for jobs as a cashier, for cleaning jobs, and in clothing stores but received no job offers. She stopped looking for work in August 1989 after she was robbed in St. Louis while on a job interview. She stated that the reasons she had not looked for work since that time were because she could not handle going out and her husband was sick. She received treatment for a nervous breakdown following the robbery. She had not searched for work since August 11, 1989. Her prior employment experience included being a cashier, a waitress, and a truck dispatcher.

Jack L. Strader, a certified rehabilitation counselor and a vocational consultant, evaluated claimant's potential for rehabilitation and for returning to work, at the request of her attorney. Although he did not conduct any labor market survey with regard to claimant, based on his familiarity with the labor market, it was his opinion that claimant was not employable in any occupation. This was based on his indication of what she could tolerate. He did not see her as a viable candidate for vocational placement, and she was a poor candidate for retraining because of the pain and because she indicated she could not sit for more than one hour at a time. Strader admitted that claimant's description of her pain was subjective. He did not review a copy of the records of Comprehensive Rehabilitation Associates, Inc. (CRA), the rehabilitation service to which respondent referred claimant. Strader conceded that a work capacity evaluation would make the assessment of claimant's capabilities a little more accurate.

At the request of respondent, claimant was reevaluated by CRA in 1993, after persons from that organization had worked with her in 1989 and 1990. In an August 19, 1993, report, rehabilitation specialist Alanna Goestenkors identified 16 job descriptions that would fit claimant in light of her physical restrictions, skills, aptitude, interests, temperament, general education development, and work experience. In her October 25, 1993, report, Goestenkors indicated a plan to seek authorization to complete a labor market survey with regard to the availability of employment options for claimant. At the time of the arbitration hearing, this apparently had not been done.

■ Claimant has the burden of proving all the essential elements of her claim by a preponderance of the evidence. *Corn Products Refining Co. v. Industrial Comm'n*, 6 Ill. 2d 439, 442-43, 128 N.E.2d 919, 921-22 (1955). In *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286-87, 447 N.E.2d 842, 845-46 (1983), the Supreme Court of Illinois summarized the rules relating to PTD as follows:

"This court has frequently held that an employee is totally and permanently disabled when he 'is unable to make some contribution to the work force sufficient to justify the payment of wages.' (*E.g., Gates Division, Harris-Intertype Corp. v. Industrial Com.* (1980), 78 Ill. 2d 264, 268; *Arcole Midwest Corp. v. Industrial Com.* (1980), 81 Ill. 2d 11, 15.) The claimant need not, however, be reduced to total physical incapacity before a permanent total disability award may be granted. (*Interlake, Inc. v. Industrial Com.* (1981), 86 Ill. 2d 168, 176; *Inland Robbins Construction Co. v. Industrial Com.* (1980), 78 Ill. 2d 271, 275.) Rather, a person is totally disabled when he is incapable of performing services except those for which there is no reasonably stable market. (*A.M.T.C. of Illinois, Inc. v. Industrial Com.* (1979), 77 Ill. 2d 482, 487.) Conversely, an employee is not entitled to total and permanent disability compensation if he is qualified for and capable of obtaining gainful employment without serious risk to his health or life. (*E.R. Moore Co. v. Industrial Com.* (1978), 71 Ill. 2d 353, 362.) In determining a claimant's employment potential, his age, training, education, and experiences should be taken into account. *A.M.T.C. of Illinois, Inc. v. Industrial Com.* (1979), 77 Ill. 2d 482, 489; *E.R. Moore Co. v. Industrial Com.* (1978), 71 Ill. 2d 353, 362.

In considering the propriety of a permanent and total disability award, this court recently stated:

'Under *A.M.T.C.*, if the claimant's disability is limited in nature so that he is not obviously unemployable, *or if there is no medical evidence to support a claim of total disability*, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances.

However, once the employee has initially established that he falls in what has been termed the "odd-lot" category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market (2 A. Larson, Workmen's Compensation sec. 57.51, at 10—164.24 (1980)), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant (2 A. Larson, Workmen's Compensation sec. 57.61, at 10—164.97 (1980)).' (Emphasis added.) *Valley Mould & Iron Co. v. Industrial Com.* (1981), 84 Ill. 2d 538, 546-47; *Interlake, Inc. v. Industrial Com.* (1981), 86 Ill. 2d 168, 177."

■ A number of cases which discuss the odd-lot category of PTD use the term *"prima facie."* These cases state that once a claimant makes a *prima facie* showing that he fits into odd lot, the burden shifts to the employer to produce evidence that some type of regular and continuous employment is available to the claimant. By using the term *"prima facie,"* this rule appears at first glance to require that the claimant must merely make a *prima facie* case, *i.e.*, produce sufficient evidence so that a finding in that party's favor could be supported if contrary evidence were ignored. However, after careful review of the language of *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47, 419 N.E.2d 1159, 1163 (1981), quoted in the *Ceco Corp.* decision, we find that the claimant must do more than make a *prima facie* case. In light of *Valley Mould*, the claimant has the burden to initially "establish" that she falls into the odd-lot category, before the burden of proof shifts to the employer to show availability of work. By using the word "establish," *Valley Mould* requires that the claimant make more than a *prima facie* case. The claimant must prove by a preponderance of the evidence that she falls into the odd-lot category. See *Meadows v. Industrial Comm'n*, 262 Ill. App. 3d 650, 653-54, 634 N.E.2d 1291, 1293-94 (1994) (holding that "claimant has the burden of *proving* that he fits into the 'odd lot' category of section 8(f) of the Act" (emphasis added)). Whether the claimant has successfully met his burden is a question of fact for the Commission to determine. *City of Green Rock v. Industrial Comm'n*, 255 Ill. App. 3d 895, 902, 625 N.E.2d 1110, 1114-15 (1993). We believe that the cases which use the term *"prima facie"* when discussing odd lot, use that term to mean "initially." See *Meadows*, 262 Ill. App. 3d at 653-54, 634 N.E.2d at 1293-94. In other words, those cases hold that the claimant must "initially" establish, by a preponderance of the evidence, that she falls into the odd-lot category, before the burden shifts to the employer to show availability of

work. See *Old Ben Coal Co. v. Industrial Comm'n*, 261 Ill. App. 3d 812, 814, 634 N.E.2d 285, 287 (1994).

The focus of the Commission's analysis is on the degree to which claimant's medical disability impairs her employability. *E.R. Moore Co. v. Industrial Comm'n*, 71 Ill. 2d 353, 362, 376 N.E.2d 206, 210 (1978). Therefore, if the Commission finds that the nature of claimant's injury is such that claimant is not permanently totally disabled in light of claimant's age, experience, training, and capabilities, the Commission is not obligated to find PTD simply because the claimant puts on some evidence that she could not find a job.

■ In this case, claimant is not obviously unemployable, and there is no medical evidence that claimant is totally disabled. In addition, claimant has not met the burden of proving that employment is unavailable to a person in her circumstances. The arbitration hearing was conducted on November 15, 1993. Even though her condition was surgically corrected in the interim, claimant had not sought employment since August 1989 for reasons not related to the physical injury of January 19, 1988. As part of claimant's case, there was medical evidence from claimant's treating physician, Dr. Marrese, that claimant could return to light-duty work and claimant's admission that she could do light-duty work. The Commission was not obligated to accept the contrary opinion of Strader that claimant was unemployable. In addition, respondent introduced medical evidence that claimant could do light-duty work and the evidence from CRA that claimant was qualified to do some types of work. The finding of the Commission that claimant was not permanently totally disabled was not against the manifest weight of the evidence.

Respondent next argues that the Commission's determination that claimant exceeded her choice of medical providers was correct as a matter of law and not contrary to the manifest weight of the evidence. We disagree.

The Commission found that Jamil was claimant's first choice and Dr. George R. Schoedinger III was her second choice, and that Marrese was therefore outside the chain of referral. Claimant first saw Schoedinger, an orthopedic surgeon, on December 20, 1988, on referral from another person, not a doctor or her attorney. She saw Schoedinger on two occasions. Schoedinger advised her to lose weight and, at the second appointment, told her that, if her weight loss was not substantial, he would no longer treat her. A bill for Schoedinger's services was never submitted to respondent. Claimant testified that, although her attorney did not refer her to either Schoedinger or Marrese, she did discuss seeing those doctors with her attorney and received his approval for her to see them prior to seeking medical services from each of them.

■ Subject to the requirement that medical expenses be necessary and reasonably required to cure or relieve the effect of the accidental injury, section 8(a) of the Act requires an employer to pay for all medical, surgical, and hospital expenses arising out of services performed by the physician, surgeon, or hospital initially chosen by the employee, or those to which the employee was referred by the initial provider, plus:

"all medical, surgical and hospital services provided by any second physician, surgeon or hospital subsequently chosen by the employee or by any other physician, consultant, expert, institution or other provider of services recommended by said second service provider or any subsequent provider of medical services in the chain of referrals from said second service provider. Thereafter[,] the employer shall select and pay for all necessary medical, surgical and hospital treatment and the employee may not select a provider of medical services at the employer's expense unless the employer agrees to such selection. *At any time the employee may obtain any medical treatment he desires at his own expense.* This paragraph shall not affect the duty to pay for rehabilitation referred to above." (Emphasis added.) 820 ILCS 305/8(a)(3) (West 1994).

This issue was addressed in *Pluto v. Industrial Comm'n*, 272 Ill. App. 3d 722, 650 N.E.2d 631 (1995). In *Pluto*, claimant sought treatment from Drs. Jones, Kostidis, Sommer, and Wojnaroski. This court determined that Jones was claimant's first physician of choice and Kostidis was his second. Claimant argued that, because he did not seek reimbursement for the bills of Sommer and Kostidis, neither should constitute one of his choices under section 8(a) of the Act, but this argument was rejected. This court noted, however, that a claimant being allowed to choose which physicians were his first and second choice might be allowed in some cases. *Pluto*, 272 Ill. App. 3d at 729-30, 650 N.E.2d at 636. This is such a case.

■ Schoedinger's records indicated that he would not see claimant again unless her weight loss was substantial. His refusal to treat her required claimant to seek treatment from another physician. Respondent argues that allowing a claimant to choose which physicians are to be considered her first and second physicians of choice will encourage "doctor shopping," where a claimant seeks treatment from a number of physicians and submits those bills that were for the greatest amount. However, the facts of this case do not indicate claimant was engaging in "doctor shopping." Furthermore, the reasonable and necessary requirement imposed by section 8(a) of the Act provides a limiting mechanism on the employer's liability for any medical treatment incurred as a result of "doctor shopping," en-

abling the Commission to find that such treatment was not reasonable and necessary.

We note there is an $11.79 discrepancy between the medical expenses awarded by the arbitrator and those directed to be awarded by the circuit court. However, since respondent has not raised an issue concerning the proper calculation of the medical expenses, we affirm the determination of the circuit court as to the amount of the medical expenses.

The judgment of the circuit court of Madison County is reversed to the extent it found that the award of PPD was against the manifest weight of the evidence and affirmed in all other respects. The Commission decision is modified to direct respondent to pay $45,505.33 in medical expenses and is affirmed as modified.

Circuit court reversed in part and affirmed in part; Commission decision affirmed as modified.

RAKOWSKI, COLWELL, and HOLDRIDGE, JJ., concur.

JUSTICE RARICK, concurring in part and dissenting in part:
I concur with the majority's conclusion that Whitis did not exceed her choice of medical providers under section 8(a) of the Act. However, I disagree with the majority's "odd-lot" analysis. The case most often cited in "odd-lot" cases is *Valley Mould*. In addressing the "odd-lot" analysis, the court stated:

"Under *A.M.T.C.*, if the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in his circumstances. However, once the employee has *initially established* that he falls in what has been termed the 'odd-lot' category (one who, though not altogether incapacitated for work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market (2 A. Larson, Workmen's Compensation sec. 57.51, at 10—164.24 (1980)), then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the claimant (2 A. Larson, Workmen's Compensation sec. 57.61, at 10—164.97 (1980)).

In the case at bar, none of the medical experts testifying were of the opinion that claimant was permanently and totally disabled. They all agreed that he could return to some form of light physical work. The objective findings in the record indicate that he had a full range of motion in his right arm and leg despite the injury,

although he had lost 'some control and strength' in those limbs. Under these circumstances, the claimant could not be considered obviously unemployable. Since he had not made out a *prima facie* case that he fell into the odd-lot category, the burden remained upon him to show his inability to return to gainful employment. It was incumbent upon him to show that, considering his present condition, in light of his age, experience, training, and education, he is permanently and totally disabled within the definition stated in *Moore* set out above. This burden may be met by a showing of diligent but unsuccessful attempts to find work (*A.M.T.C. of Illinois, Inc. v. Industrial Com.* (1979), 77 Ill. 2d 482, 490[, 397 N.E.2d 804]), or by proof that because of the above-mentioned qualities he is unfit to perform any but the most menial tasks for which no stable market exists." (Emphasis added.) *Valley Mould*, 84 Ill. 2d at 546-47, 419 N.E.2d at 1163.

Determining whether a claimant fits into the "odd-lot" category involves a two-step analysis. First, we look to see whether his disability is so great that he is obviously unemployable *or* whether there is any medical evidence that he is permanently and totally disabled. If either of these conditions is met, claimant need not show the unavailability of employment to one in his circumstances. The employer, of course, may offer evidence to rebut claimant's *prima facie* case of total and permanent disability. If, on the other hand, the claimant is not obviously unemployable *or* if there is no medical evidence to support a claim that he is permanently and totally disabled, then claimant may be awarded permanent and total disability benefits if he shows that he fits into the "odd-lot" category. This triggers the second part of the analysis. Having failed to present a case for permanent and total disability based upon medical evidence supporting such a claim or by demonstrating that he is clearly unemployable, did claimant nevertheless show that he fit into the odd-lot category? An odd-lot claimant is one who is not altogether incapacitated for work but is so handicapped that he cannot be employed in any well-known branch of the labor market. *Valley Mould*, 84 Ill. 2d at 547, 419 N.E.2d at 1163. A *prima facie* case for odd-lot status may be established in one of two ways: (1) by showing diligent but unsuccessful attempts to find work or (2) by showing that because of his condition, age, training, education, and experience he is unfit to perform any but the most menial tasks for which no stable market exists. See *Interlake, Inc. v. Industrial Comm'n*, 86 Ill. 2d 168, 178, 427 N.E.2d 103, 108 (1981). If the claimant shows he falls into the odd-lot category, then the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available. *Valley Mould*, 84 Ill. 2d at 547, 419 N.E.2d at 1163.

Jack Strader, a certified rehabilitation consultant, testified that, based upon his evaluation and the reports of Dr. Marrese, Whitis was not employable in any occupation. Based upon this, I would conclude that claimant presented a *prima facie* case for odd-lot status by introducing sufficient evidence to demonstrate that because of her age, training, skills, and work history she is unfit to perform any but the most menial tasks for which no stable market exists. As such, it was incumbent upon the employer to present evidence to show that some kind of suitable work was regularly and continuously available. The employer's evidence of regularly and continuously available work consists of the 1989 and 1993 evaluations by CRA and the opinion of Dr. Randolph. With respect to the 1989 CRA report, it is of little relevance to claimant's employability in 1993. There is no evidence that the labor market survey performed in 1989 was applicable when claimant was released by Dr. Marrese in 1993 or that the jobs listed in the survey were within Whitis's physical restrictions. Indeed, in 1989, claimant was still under medical care, and her permanent restrictions were unknown. With respect to CRA's 1993 report, I note that although the rehabilitation specialist concluded that there were 16 types of jobs claimant could perform, no labor market survey was performed to verify that such jobs were actually available. For the employer to meet its burden, it is not enough to show that claimant could work, but instead the employer must show that there are in fact jobs available which she could perform. I believe Lanter Courier failed to meet its burden. Accordingly, the circuit court correctly found that the Commission erred in failing to award claimant permanent and total disability benefits.

I also cannot agree with the contention of the majority that a claimant must make more than a *prima facie* case in order to shift the burden to the employer. In my view, the analysis employed by the court in *Valley Mould* clearly demonstrates that it used the terms "initially established" and *prima facie* synonymously.