ANGEL TARANGO, Appellant, v. STATE INDUSTRIAL INSURANCE SYSTEM, an Agency of the State of Nevada, nka EMPLOYERS INSURANCE COMPANY OF NEVADA; and CHAMPION DRYWALL, Respondents.

No. 34462

June 13, 2001

25 P.3d 175

*Greenman, Goldberg, Raby & Martinez* and *Esther Rodriguez* and *Lisa M. Anderson,* Las Vegas, for Appellant.

*Kimberly A. Wanker, Ltd.,* Henderson, for Respondent Champion Drywall.

*Javier A. Arguello,* Associate General Counsel, Las Vegas, for Respondent Employers Insurance Company of Nevada.

*Gugino & Schwartz* and *John P. Lavery,* Las Vegas, for Amicus Curiae Nevada Contractor's Network Self-Insured Group.

**OPINION**

By the Court, LEAVITT, J.:

This appeal is from an order of the district court denying a petition for judicial review. Appellant Angel Tarango is an undocumented worker who was injured during the course of his employment with a Nevada employer. Although Tarango received

workers' compensation benefits under Nevada's Industrial Insurance Act, he was denied vocational rehabilitation benefits. The primary question presented on appeal is whether an undocumented alien is precluded from receiving vocational training under Nevada's workers' compensation scheme if those benefits would be in violation of federal law, state law, or the Equal Protection Clause. We conclude that although compensation can be paid to an injured undocumented worker pursuant to the state's workers' compensation scheme, formal vocational training must be denied if that training is required solely because of immigration status. Therefore, we affirm the district court's order awarding Tarango permanent partial disability payments, but denying him vocational rehabilitation benefits.

## *FACTS*

Appellant Tarango suffered an industrial injury in January 1996 after he fell from an eight-foot ladder while putting up drywall. Tarango was taken to a University Medical Center Quick Care facility, and there he was diagnosed with a lumbosacral sprain. By early 1997, Tarango's physician stated that Tarango had received maximum medical treatment, and Tarango was cleared to return to the workforce. However, because of the injury, Tarango was limited to permanent medium duty work in which he was to lift no more than fifty pounds. Since Tarango's position with Champion Drywall required more vigorous activity than Tarango's medical clearance would allow, Tarango's physician recommended vocational rehabilitation.

In June 1997, insurer State Industrial Insurance System (SIIS) awarded Tarango permanent partial disability (PPD) based upon a ten percent whole person impairment. Additionally, because of the permanent work restrictions placed upon him, Tarango also applied for vocational rehabilitation benefits, pursuant to NRS 616C.530.

Commensurate with federal law, however, SIIS issued a written determination stating that before Tarango could receive vocational rehabilitation benefits, he was required to submit Immigration and Naturalization Form I-9. The form is required as proof of an alien's legal right to work in the United States. When Tarango failed to satisfy the verification requirement, SIIS suspended his benefits until such proof could be presented.

In two separate proceedings in August and October, 1997, a hearing officer affirmed both the SIIS decisions to award Tarango ten percent PPD, and to deny Tarango vocational rehabilitation benefits absent proof of a legal right to work.

On appeal of the hearing officer's determination, the appeals officer held that the ten percent PPD award was supported by the

totality of the documentary evidence. Further, the appeals officer determined that federal law supported SIIS's denial of vocational rehabilitation benefits. Specifically, the appeals officer stated that the federal Immigration Reform and Control Act[1] (IRCA)—which prohibits individuals, entities, or state agencies from providing employment opportunities for illegal aliens—preempted SIIS's duties to provide Tarango with vocational rehabilitation benefits under NRS 616C.530.

Tarango's subsequent petition for judicial review was denied by the Honorable James C. Mahan on May 26, 1999. The district court held that there was substantial evidence in the record to support the appeals officer's decision. Tarango now appeals.

## DISCUSSION

This is a case of first impression. The Nevada Industrial Insurance Act (NIIA) states that an employee or worker includes "*every person* in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, *whether lawfully or unlawfully employed*."[2] Therefore, Nevada's workers' compensation laws apply to all injured workers within the state, regardless of immigration status. However, the issue before this court is not whether Tarango can receive workers' compensation under our laws; rather, we must determine whether an injured undocumented worker's access extends to the full depths of the workers' compensation scheme.

Unlike compensatory benefits which award monetary relief, vocational rehabilitation benefits are designed to return the injured worker to the workforce by helping him obtain employment within his physical abilities. We conclude that if Champion Drywall provided Tarango with modified employment, Champion Drywall would be circumventing the IRCA. Further, if SIIS provided Tarango with vocational rehabilitation benefits to obtain further training, SIIS would be violating state law and the Equal Protection Clause.

It is well settled that Congress has the power to impose alienage legislation on the states.[3] Moreover, it is well established that immigration legislation "is unquestionably exclusively a federal power."[4] Although the states do have some authority to deal with

---

[1] 8 U.S.C. § 1324a (1998).

[2] NRS 616A.105 (emphasis added).

[3] *See Free v. Bland,* 369 U.S. 663, 666 (1962).

[4] *See De Canas v. Bica,* 424 U.S. 351, 354 (1976); *see also Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419 (1948).

aliens in a manner that "mirrors federal objectives and furthers a legitimate state goal," state interests must ultimately give way to the federal government's broad power to regulate matters of alienage.[5]

Congressional power to oversee immigration stems from a variety of sources. Primarily, the United States Constitution grants Congress the authority to "establish an uniform Rule of Naturalization."[6] Further, Congress has plenary power with respect to both foreign relations and global commerce.[7] These powers, coupled with the inherent authority of the sovereign to close its borders, have created an intricate scheme governing the admission and status of aliens within the United States.[8]

The United States Supreme Court has expanded this authority further by recognizing the power as plenary, or "largely immune from judicial inquiry and interference."[9] Specifically, the Court has stated that the "obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into this field."[10] Similarly, the Court has held that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."[11] This power not only extends to the admission and naturalization of aliens, but also to the "regulation of their conduct before naturalization."[12] As a result, we must conclude that because of the federal government's plenary power in the area of alienage, any legislation created by Congress—such as the IRCA—preempts Nevada's workers' compensation laws as those laws have an effect on aliens in this state.

The IRCA was designed by Congress to establish procedures that make it more arduous to employ unauthorized aliens, and to punish those employers who knowingly offer jobs to unauthorized aliens.[13] The Act defines an "unauthorized alien" as an individ-

---

[5]*Plyler v. Doe,* 457 U.S. 202, 219 n.19, 225 (1982) (citing *De Canas,* 424 U.S. 351).

[6]U.S. Const. art. I, § 8, cl. 4.

[7]*See id.; Mathews v. Diaz,* 426 U.S. 67, 81 n.17 (1976).

[8]*See Plyler,* 457 U.S. at 225; *see also Harisiades v. Shaughnessy,* 342 U.S. 580 (1952).

[9]*Harisiades,* 342 U.S. at 588-89.

[10]*Plyler,* 457 U.S. at 225.

[11]*Mathews,* 426 U.S. at 84.

[12]*Takahashi,* 334 U.S. at 419.

[13]*See Dowling v. Slotnik,* 712 A.2d 396, 404 (Conn. 1998).

ual who is not "lawfully admitted for permanent residence, or . . . authorized to be so employed" in the United States.[14]

Specifically, the Act precludes employers not only from hiring unauthorized aliens, but also from continuing to employ those workers once the employer becomes aware of the employee's illegal status.[15] Violators are punished with substantial fines as well as possible imprisonment.[16]

We conclude that because Tarango could not substantiate his legal right to work with an Immigration and Naturalization Form I-9, he squarely fell into Congress' definition of an "unauthorized alien." As a result, Champion Drywall could no longer continue to employ Tarango—once Tarango's undocumented status was determined—without violating the IRCA and incurring federal penalties.

We note, however, that although the language of the IRCA focuses on punishing the employer of unauthorized aliens, or those agencies that refer unauthorized aliens for a fee, the Act does not provide a reference point for the insurer's role. SIIS is not employing Tarango or referring him for a fee. Thus, it is our view that although SIIS would be facilitating future employment for an unauthorized alien by providing vocational rehabilitation benefits, there is no indication that SIIS is prohibited or would be punished under the IRCA for its involvement. Further, we do not consider it outside the realm of possibility that appellant's future employment lies outside the boundaries of the United States, and such vocational training could be put to use elsewhere.

Nonetheless, we conclude that SIIS is precluded from providing vocational training pursuant to state law. The state law in question is NRS 616C.530. The statute provides:

> An insurer shall adhere to the following priorities in returning an injured employee to work:
> 1. Return the injured employee to the job he had before his injury.
> 2. Return the injured employee to a job with the employer he worked for before his accident that accommodates any limitation imposed by his injury.
> 3. Return the injured employee to employment with another employer in a job that uses his existing skills.
> 4. Provide training for the injured employee while he is working in another vocation.

---

[14]8 U.S.C. § 1324a(h)(3).

[15]*See* 8 U.S.C. § 1324a(a)(2).

[16]*See* 8 U.S.C. § 1324a(e)(4), (f)(1).

5. Provide formal training or education for the injured employee in another vocation.[17]

We have held in the past that "[t]he intent of the legislature is the controlling factor in statutory interpretation."[18] Here, NRS 616C.530 declares itself to be based on priority, and as a result, we conclude that the intent of the legislature is clear and should be given its ordinary meaning.[19] Thus, the statute provides that the insurer shall first attempt to return the injured worker to his former job, and lastly, the insurer shall provide formal training or education.[20]

In this instance, SIIS determined to deny all vocational training benefits because Tarango failed to provide proof of his lawful right to work in the United States. We conclude that this determination was in harmony with the IRCA and NRS 616C.530.

Foremost, if Tarango was a documented worker, he clearly could have returned to similar employment in the United States. Tarango was not incapacitated. Rather, the record indicates that the only limitation on Tarango's abilities was that he should lift no more than fifty pounds.

Tarango's ability to work placed SIIS in a precarious position. First, SIIS could have returned Tarango to the workforce in a capacity provided by NRS 616C.530, and thereby caused an employer to violate the IRCA by hiring Tarango. Second, SIIS could have ignored the priority scheme established by the legislature in the vocational rehabilitation statute and awarded Tarango formal training based solely on his illegal status. Or third, SIIS could have denied all vocational rehabilitation benefits. We conclude that the latter option was the only logical choice.

As to the first alternative, Tarango's injury prevented him from returning to Champion Drywall in his former role. Therefore, NRS 616C.530(1) was never at issue. However, NRS 616C.530(2) and (3) were clearly applicable. Because Tarango could return to the workforce in a limited role, SIIS was required by the priority scheme to return Tarango to Champion Drywall or to a similarly

---

[17]NRS 616C.530.

[18]*Cramer v. Peavy,* 116 Nev. 575, 580, 3 P.3d 665, 669 (2000) (quoting *Cleghorn v. Hess,* 109 Nev. 544, 548, 853 P.2d 1260, 1262 (1993)).

[19]*See City Council of Reno v. Reno Newspapers,* 105 Nev. 886, 891, 784 P.2d 974, 977 (1989).

[20]NRS 616C.530. "[I]n statutes, 'may' is permissive and 'shall' is mandatory unless the statute demands a different construction to carry out the clear intent of the legislature." *S.N.E.A. v. Daines,* 108 Nev. 15, 19, 824 P.2d 276, 278 (1992).

situated employer. Yet, as previously noted, such placement by SIIS would have required the employer to knowingly violate the IRCA and incur substantial penalties. Although SIIS would not have incurred those penalties, we conclude that this alternative would have led to an illogical and absurd result.[21]

Under the second alternative, SIIS would be required to ignore the priority scheme established by the legislature in NRS 616C.530 and to provide Tarango with formal training based solely on his illegal status.[22] Yet, we conclude that the agency's authority is not so broadly extended. Although SIIS is "impliedly clothed with power to construe the relevant laws and set necessary precedent to administrative action," it is not permitted to circumvent the legislature's clear intent in creating the prioritized rehabilitation scheme.[23]

Further, we fail to comprehend how providing Tarango with formal training would create more efficiency in the workers' compensation system. The system is designed to "ensure the quick and efficient payment of compensation to injured and disabled employees at a reasonable cost to the employers."[24] Awarding Tarango formal vocational training under NRS 616C.530(4) and (5) diametrically opposes the express intent of our workers' compensation scheme.

Specifically, NRS 616C.530(4) necessitates providing Tarango with formal vocational training that runs concurrent with his employment. The IRCA prohibits Tarango's employment in the United States. Thus, SIIS would be required to provide training outside of Nevada. The NIIA was not intended as a means to expand the agency's powers to award vocational benefits beyond the borders of Nevada—let alone the borders of the United States.[25]

Likewise, it is our view that dangerous precedent is set in

---

[21]Statutory interpretation should avoid absurd or unreasonable results. *General Motors v. Jackson,* 111 Nev. 1026, 1029, 900 P.2d 345, 348 (1995).

[22]NRS 616C.530(4)–(5).

[23]*SIIS v. Miller,* 112 Nev. 1112, 1118, 923 P.2d 577, 581 (1996). "SIIS is clearly a state agency for the following reasons: (1) *it is subject to the approval and control of the Governor, the legislature, and other agencies of the government;* (2) it is treated as the State or a state agency throughout the Nevada Revised Statutes; and (3) it possesses certain powers of a sovereign authority." *Northern Nev. Ass'n Injured Workers v. SIIS,* 107 Nev. 108, 112-13, 807 P.2d 728, 731 (1991) (emphasis added) (footnotes omitted).

[24]NRS 616A.010.

[25]NRS 616C.580 states that "[e]xcept as otherwise provided in this section, vocational rehabilitation services must not be provided outside of this state."

allowing an undocumented worker to skip through the priority scheme directly to NRS 616C.530(5). Under this option, SIIS would be required to offer Tarango formal training for a different vocation outside the United States. However, it is clear that this training would only be available to Tarango because of his undocumented status. If he were a legal worker, this option would never become available.

More importantly, by allowing an undocumented worker to advance to NRS 616C.530(5)—without regard for his injuries—this court would be providing a pathway that would lead all injured undocumented workers to the most expensive remedy provided under the scheme. The formal vocational training "would bear no relationship to 'medical eligibility,' the extent of disability or need for retraining."[26] Not only would the costs of such training create an excessive burden on SIIS and the employers of Nevada, but it would also undermine the purpose behind Nevada's workers' compensation scheme.

■■■■■■■■

Vocational rehabilitation was designed to provide methods to promptly return the employee to the workforce. But here, Tarango would not be using the scheme to return to his former or a similar job. Rather, he would be using Nevada's workers' compensation scheme as an avenue to a better career. This was not the intent of the legislature. The legislature intended a priority scheme to be established in order to provide efficiency and cost-effectiveness. "[W]hen the language of a statute is plain, its intention must be deduced from such language, and the court has no right to go beyond it."[27] As a result, we conclude that SIIS properly denied Tarango's vocational rehabilitation claim because of his undocumented status.

■■■■■■■■

It should be noted that Tarango also contends that SIIS's denial of his vocational rehabilitation benefits violates the 14th Amendment. We disagree.

The 14th Amendment to the United States Constitution states that:

> *No State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or

---

[26]*Del Taco v. Workers' Comp. App. Board,* 94 Cal. Rptr. 2d 825, 828-29 (Cal. Ct. App. 2000).

[27]*Cirac v. Lander County,* 95 Nev. 723, 729, 602 P.2d 1012, 1015 (1979) (quoting *State ex rel. Hess v. The County Commissioners of Washoe County,* 6 Nev. 104, 107 (1870)).

property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[28]

In analyzing the language of the 14th Amendment, the United States Supreme Court has recognized that aliens are considered "persons" for purposes under that amendment.[29] Further, the Court has held that the amendment's phrase "within its jurisdiction" emphasizes that the umbrella of equal protection covers "all within a State's boundaries, and to all upon whom the State would impose the obligations of its laws."[30] Therefore, aliens—whether documented or undocumented—are to be provided such protections.[31] And as a result, appellant contends that because SIIS is a governmental agency acting as an arm of the State of Nevada, it must comply with the Equal Protection Clause even when administering workers' compensation benefits to undocumented workers. We agree.

In considering an equal protection challenge, the court must first determine the appropriate standard of review. This court's standard for examining the validity of legislation under the Equal Protection Clause is the same as the federal standard.[32] Thus, the proper standard of review depends on the classification to be considered, and the appropriate level of scrutiny to be applied to the affected interest.[33]

The highest level of scrutiny—strict scrutiny—is applied in cases involving fundamental rights or a suspect class.[34] Under strict scrutiny, legislation should only be upheld if it is necessary to advance a compelling state interest, and it is narrowly tailored to achieve that interest.[35]

Comparatively, a lesser standard of review is required when the classification does not affect fundamental liberties.[36] Under this

---

[28]U.S. Const. art. XIV, § 1 (emphasis added).

[29]*See Plyler,* 457 U.S. at 210.

[30]*Id.* at 214.

[31]*See id.*

[32]*See Laakonen v. District Court,* 91 Nev. 506, 538 P.2d 574 (1975).

[33]*See Gaines v. State,* 116 Nev. 359, 998 P.2d 166 (2000).

[34]*See id.*

[35]*See id.*

[36]*See id.*

level of scrutiny, legislation meets its burden of review so long as it is rationally related to a legitimate government interest.[37] The "rational basis test" generally presumes that the law is constitutional, and thus, the courts show deference to the legislation.[38]

Between these two standards of review lies an intermediate level of scrutiny, which generally has been applied to matters of gender or illegitimacy.[39]

Appellant contends that the standard of review should meet that of a compelling state interest. Under the due process guarantee, the courts will require a compelling interest whenever laws distinguish persons based on classification.[40] Thus, "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."[41] This court has applied similar reasoning in affording aliens the protection of strict scrutiny review.[42]

However, although we conclude that undocumented aliens have a right to equal protection under the 14th Amendment, the United States Supreme Court has "reject[ed] the claim that 'illegal aliens' are a 'suspect class.' "[43] To the contrary, entry into the undocumented alien classification is not done by some involuntary action such as entry into suspect classifications based on minority or origin. Rather, the Court has stated that "entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime."[44]

As a result, the *Plyler* Court refused to acknowledge undocumented aliens as a suspect class, and in doing so, the Court stated that deference must be given to the legislature in determining classification schemes for those illegally in the United States.[45] Further, the Court held that state legislation concerning those individuals must only include "some fair relationship to a legitimate public purpose."[46] Consequently, it is our view that state

---

[37]*See Sereika v. State,* 114 Nev. 142, 143-45, 955 P.2d 175, 179 (1998).

[38]*See Plyler,* 457 U.S. at 216.

[39]*See Clark v. Jeter,* 486 U.S. 456, 461 (1988).

[40]*See Graham v. Richardson,* 403 U.S. 365, 371-72 (1971).

[41]*Id.* at 372; *see also U.S. v. Carolene Products Co.,* 304 U.S. 144, 152 n.4 (1938).

[42]*See State v. Chumphol,* 97 Nev. 440, 441, 634 P.2d 451, 451 (1981).

[43]*Plyler,* 457 U.S. at 219 n.19.

[44]*Id.*

[45]*See id.* at 216.

[46]*Id.*

action disfavoring undocumented aliens with disparate treatment is not prohibited so long as the legislation is fairly related to a legitimate state purpose.[47]

Here, the priority scheme of NRS 616C.530 was designed by the legislature with the intent to efficiently return injured employees back into the workforce. If SIIS were required to offer Tarango vocational training merely because Tarango was illegally in the country, he would unfairly benefit from services prohibited to all legal workers solely because of his undocumented status.[48] Such a consequence would result in disparate treatment of those lawfully entitled to work in Nevada, and would be in violation of the Equal Protection Clause since all those similarly situated must be treated in a like manner.[49]

Appellant Tarango is an undocumented alien. Unauthorized entry into the United States is a crime.[50] Consequently, the United States Supreme Court has stated that benefits may be withheld "from those whose very presence within the United States is the product of their own unlawful conduct."[51] As a result, we conclude that SIIS's denial of appellant's vocational rehabilitation benefits was fairly related to a legitimate government purpose.

## CONCLUSION

We conclude that the IRCA preempts Nevada's workers' compensation scheme insofar as it provides undocumented aliens with employment within the boundaries of the United States. Further, the legislature's priority scheme under NRS 616C.530, and the Equal Protection Clause, preclude SIIS from awarding formal vocational training to undocumented workers. As a result of these conclusions, we affirm the order of the district court awarding

---

[47]*Id.*

[48]All employees legally working in Nevada who could return to work in a modified role would be precluded from formal training. Based on the vocational rehabilitation priority scheme, NRS 616C.555(2) provides: "If the counselor determined . . . that the injured employee has existing marketable skills, the plan [for vocational rehabilitation benefits] must consist of *job placement assistance only.*" (Emphasis added.)

[49]*See Romer v. Evans,* 517 U.S. 620, 631-35 (1996); *see also Del Taco,* 94 Cal. Rptr. 2d at 828-29. The *Del Taco* court concluded that awarding injured undocumented aliens vocational training not commensurate with injuries violated the Equal Protection Clause as to the employer as well as third parties not before the court. *See id.* Specifically, the court stated that requiring the employer to pay more in workers' compensation for an undocumented worker who was injured than a legal worker solely because of immigration status was "irrational and arbitrary" and violated the Clause. *Id.*

[50]*See* 8 U.S.C. § 1325(a).

[51]*Plyler,* 457 U.S. at 219.

appellant permanent partial disability, but denying appellant vocational rehabilitation benefits.

YOUNG, AGOSTI, ROSE and BECKER, JJ., concur.

SHEARING, J., concurring:

I agree with CHIEF JUSTICE MAUPIN's analysis of the law; however, I do not agree that a remand is required "for a more fact-intensive determination."

The record is clear that Angel Tarango is employable in his present condition. SIIS has already found that he is fully capable of employment, but is only restricted from lifting over fifty pounds. He has been compensated for this ten percent disability. He can work but just not at a job requiring lifting more than fifty pounds and not legally in this country. Therefore, he is not eligible for rehabilitation benefits.

I agree with the majority in affirming the judgment of the district court.

MAUPIN, C. J., concurring and dissenting:

Angel Tarango is an undocumented alien worker who was severely injured in the course and scope of his employment with a Las Vegas drywall contractor. After collecting wage, medical, and disability benefits, he submitted a claim for vocational rehabilitation to the SIIS.[1] An administrative appeals officer upheld denial of the claim on the ground that providing rehabilitation services to Mr. Tarango would violate the federal Immigration Reform and Control Act ("IRCA") of 1986. The district court denied Mr. Tarango's petition for judicial review of that decision.

I would remand this matter for a more fact-intensive determination of his actual ability to undertake substitute employment given his physical limitations. If he is actually employable apart from his immigration status and despite his physical disability, I agree he is ineligible for retraining and rehabilitation under our workers' compensation laws. If re-employment is not feasible apart from his immigration status, he should be entitled to rehabilitation benefits because IRCA, in my view, does not per se preempt state laws allowing participation in the legal aspects of a rehabilitation program.

*Legality of vocational rehabilitation benefits*

The majority correctly observes that, under the priorities of NRS 616C.530, legal workers may not receive the benefits of a rehabilitation program if they can re-enter the workforce in one of

[1]NRS 616C.530.

the enumerated capacities. Accordingly, if Mr. Tarango would be re-employable but for his undocumented status, he would be ineligible as a matter of state law for retraining and rehabilitation. Thus, if Mr. Tarango is physically re-employable, his forced admission into a rehabilitation program provided under NRS 616C.530 would be mandated only because of his illegal status. This, as also noted by the majority, would be manifestly unfair. Certainly, what is illegal for a documented worker must be illegal for an undocumented worker. I therefore further agree that there is no impediment under the state or federal constitutions to his exclusion from a program under this alternative.

As noted below, however, the analysis of eligibility under state law changes if Mr. Tarango is not, in any event, able to pursue re-employment or substitute employment.

*Preemption*

The majority concludes that IRCA preempts the Nevada Industrial Insurance Act ("NIIA") merely because it may have an effect on aliens working in the State of Nevada. On the other hand, the majority observes that there is no indication that the SIIS is prohibited from or would be punished under IRCA for providing certain rehabilitation services to Mr. Tarango. While I agree with the second position taken by the majority, I disagree with the first and conclude that IRCA does not preempt the provisions of the NIIA that provide rehabilitation services, short of job placement, to an undocumented alien. Without preemption, there is no federal prohibition against Mr. Tarango's participation in a program that does not violate IRCA.

It is true that, under the Supremacy Clause[2] of the United States Constitution, any state law in conflict with federal law must yield to the federal mandate. However, the United States Supreme Court has always exercised restraint and caution in determining whether a particular state law conflicts with federal law.[3] Indeed, in *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*,[4] the Court stated that "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion or that the Congress has unmistakenly so ordained.' "

As discussed in *De Canas v. Bica*,[5] the United States Supreme

---

[2]U.S. Const. art. VI, cl. 2.

[3]*See, e.g., Chicago & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981); *De Canas v. Bica*, 424 U.S. 351 (1976); *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132 (1963).

[4]450 U.S. at 317 (quoting *Florida Lime Growers*, 373 U.S. at 142).

[5]424 U.S. 351 (1976).

Court employs a three-part test to determine whether federal law must preempt state law. First, federal law preempts state law when a state purports to regulate an area exclusively reserved for the federal government.[6] Second, federal law preempts state law if Congress has sought to occupy the field: that is, when Congress clearly intends to oust state authority to regulate that type of conduct, even if the state regulation is consistent with federal objectives.[7] Third, federal law preempts state law if it " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "[8] Failure on any one of these three tests results in federal preemption.

There is no real dispute in this case that the NIIA rehabilitation scheme satisfies the first two tests. Nevada clearly has the authority to protect its workers (lawfully and unlawfully employed) under a no-fault workers' compensation system. This notwithstanding, all three tests are discussed below.

Under the first *De Canas* test, we must determine whether the state enactment that in some way impacts aliens is a regulation of immigration. Because the power to regulate immigration is exclusively a federal power, state statutes that regulate immigration are constitutionally proscribed.[9] In this instance, the NIIA provides benefits for all employees, undocumented or otherwise.[10] However, the *De Canas* Court emphasized that a state enactment does not automatically equate to a regulation of immigration, and ipso facto preemption of state law, because it deals in some manner with aliens.[11] The Supreme Court noted that state statutes should not be branded as regulatory merely because the legislation has "some purely speculative and indirect impact on immigration."[12] The NIIA rehabilitation scheme is intended to provide certain benefits to all Nevada workers; it does not, in any respect, purport to regulate immigration.

Likewise, under the second *De Canas* test, it cannot be said that there is any manifestation of Congress's intent to oust state authority to rehabilitate undocumented injured workers.[13] Prior to

---

[6]*Id.* at 354-56.

[7]*Id.* at 356-63.

[8]*Id.* at 363 (quoting *Florida Lime Growers,* 373 U.S. at 141; *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)).

[9]*Id.* at 354-56.

[10]NRS 616A.105.

[11]*De Canas,* 424 U.S. at 355.

[12]*Id.*

[13]*See Dowling v. Slotnik,* 712 A.2d 396 (Conn. 1998) (holding that IRCA does not diminish state's authority to award workers' compensation benefits to undocumented alien workers).

IRCA's enactment, it was long established that undocumented alien workers were able to collect workers' compensation benefits.[14] Had Congress intended to preclude states from continuing to provide these benefits, it could have explicitly done so under IRCA.

In my view, only the third *De Canas* test, *i.e.,* whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, provides an arguable basis for federal preemption. However, I do not believe that the rehabilitation of undocumented workers under the NIIA interferes with federal legislative objectives.

Congress enacted IRCA in an effort to reduce the illegal immigration of alien workers to the United States.[15] Recognizing that the most effective method of discouraging illegal immigration is to make undocumented workers less attractive employees, Congress criminalized the employer's side of the employment relationship. This policy is underscored by the legislative history of the federal act:

> Employment is the magnet that attracts aliens here illegally or, in the case of nonimmigrants, leads them to accept employment in violation of their status. Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.[16]

Thus, IRCA makes it unlawful "to [knowingly] hire, or to recruit or refer for a fee," any unauthorized alien for employment in the United States.[17] IRCA does not, however, "reduce the legal protections and remedies for undocumented workers under other laws."[18] Indeed, to do so would "exacerbate the appeal of illegal

[14]Michelle Mcaloon, Comment, *Working But Not "Available to Work": Reconciling the Rights of Undocumented Laborers With the Immigration Reform and Control Act of 1986,* 15 Chicano-Latino L. Rev. 92, 109 (1994); John W. Sagaser, Casenote, *Rights Without a Remedy—Illegal Aliens Under the National Labor Relations Act: Sure-Tan, Inc. and Surak Leather Company v. NLRB,* 27 B.C. L. Rev. 407, 445 (1986).

[15]*McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 481 (1991); *see also* Elizabeth M. Dunne, Comment, *The Embarrassing Secret of Immigration Policy: Understanding Why Congress Should Enact an Enforcement Statute for Undocumented Workers,* 49 Emory L.J. 623, 626 (2000) (citing Pub. L. No. 99-603, 100 Stat. 3359; Philip Shenon, *"Startling" Surge is Reported in Illegal Aliens from Mexico,* N.Y. Times, Feb. 21, 1986, at A1).

[16]H.R. Rep. No. 99-682(I), at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650.

[17]8 U.S.C. § 1324a (1986).

[18]*Nat'l Labor Relations Bd. v. A.P.R.A. Fuel Oil Buyers Group, Inc.,* 134 F.3d 50, 56 (2d Cir. 1997).

workers to unscrupulous employers," and directly contravene Congress's intent in enacting IRCA.[19] I wish to note in this connection that there is no evidence of any untoward behavior by this employer. This, however, does not change the policy behind preserving certain protections afforded to undocumented workers.

In contrast, beyond the placement of a worker in new or substitute employment, the NIIA contains no requirement affecting alien workers that would constitute illegal misconduct under IRCA. Rather, the NIIA primarily alters a worker's ability to sue his employer in tort in exchange for "no-fault" employment benefits. Under NIIA, "[t]he employee forfeits his common-law right to sue his employer for negligence, while the employer gives up most common-law defenses."[20] The purpose of this statutory construct is to efficiently provide compensation to workers for injuries suffered as the result of their employment.[21] Absent a workers' compensation scheme, an undocumented worker, like a documented one, could sue his employer in a common law tort action. His immigration status would be no bar to such a suit.[22] By simply replacing the employee's negligence cause of action with the workers' compensation scheme, Nevada does not encourage illegal immigration; instead, it merely provides a vehicle to compensate for workplace injuries. Thus, the NIIA does not stand as an obstacle to the accomplishment and execution of the purposes and objectives of IRCA.[23]

The NIIA provides the following options to the workers' compensation insurer: (1) return the employee to his original position; (2) return the employee to the original position in a modified role; (3) return the employee to employment with another employer in order to make use of his existing skills; (4) provide formal retraining while he works in another profession; and (5) provide formal training or education for a new vocational endeavor.[24]

I agree that substitute employment under the NIIA rehabilitation scheme would violate IRCA. However, as the majority seemingly agrees, the SIIS need not violate IRCA under the facts of this case. Because Mr. Tarango's prior job requires more vigorous work than his permanent disability permits, he is eligible for

[19]*Id.*

[20]*Goldstine v. Jensen Pre-Cast,* 102 Nev. 630, 631, 729 P.2d 1355, 1356 (1986).

[21]*Id.*

[22]*See Peterson v. Neme,* 281 S.E.2d 869, 870-71 (Va. 1981) (recognizing that in a majority of jurisdictions, unlawful aliens have standing to sue).

[23]*See Dowling,* 712 A.2d 396 (holding that IRCA does not prevent a state from awarding workers' compensation benefits to an undocumented alien, injured in the course of her employment).

[24]NRS 616C.530.

vocational retraining under Nevada law if he is otherwise not medically eligible for re-employment or substitute employment.[25] Vocational retraining does not entail job placement or referral of an undocumented worker for a fee. Providing a pure rehabilitation program to someone injured while in the service of a domestic employer does not per se violate the act and, certainly, the Immigration and Naturalization Service can deport him at any time.[26]

Thus, I disagree that Mr. Tarango is absolutely barred from eligibility. If he is medically ineligible for re-employment because of the nature of his work-related injuries, he should be eligible to participate in a legal rehabilitation program if the department of immigration would let him do so. Again, however, if found to be re-employable on a substitute basis or otherwise, Mr. Tarango is precluded from participation in any rehabilitation program legally unavailable to legal workers.

I would therefore hold that IRCA does not preempt the NIIA. If IRCA does not preempt the NIIA in this instance, there is no federal impediment preventing the SIIS from awarding rehabilitation benefits short of placement in the workforce. Hence, I would reverse and remand this matter with instructions for the district court to order the SIIS to reconsider Mr. Tarango's request for vocational retraining.[27]

I also would not reach the issue of whether granting vocational retraining benefits to Mr. Tarango violates some unknown, documented worker's equal protection rights because that hypothetical worker is not a represented party before this court in this matter.[28]

---

[25]*Id.*

[26]Additionally, IRCA criminalizes the transport of an alien into the United States through non-designated ports of entry, illegal transport of aliens within the United States, the knowing or reckless harboring of undocumented aliens, and the knowing or reckless encouragement of undocumented aliens to enter or reside in the United States. 8 U.S.C. § 1324(a) (1994). Placing undocumented workers in a rehabilitation program does not, in and of itself, implicate any of these prohibitions. The worker may still be deported at any time—the program does nothing to prevent the Immigration and Naturalization Service from acquitting its responsibilities.

[27]The majority suggests that Mr. Tarango is not incapacitated or permanently disabled. Although he was cleared for light duty work at the administrative level, the record is unclear as to whether he is able to pursue any of the employment options under NRS 616C.530. This is underscored by the fact that the employer in this case has no position available that would accommodate Mr. Tarango's physical infirmities. This, of course, eliminates the first two employment options under NRS 616C.530. Thus, I would remand this matter as suggested.

[28]*See, e.g., Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Bd.,* 237 F.3d 639, 650 (D.C. Cir. 2001) (holding that the respondents do not have standing to assert the equal protection rights of third parties).