ECONOMY PACKING COMPANY, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Ramona Navarro, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—07—2947WC

Opinion filed December 9, 2008.—Rehearing denied January 28, 2009.

284

HOLDRIDGE, J., specially concurring.

Ganan & Shapiro, P.C., of Chicago (Michelle L. LaFayett, of counsel), for appellant.

Michael W. Rathsack, of Chicago (Montgomery W. Mackey, Jack L. Kramer, and Michael W. Rathsack, of counsel), for appellee.

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Economy Packing Company (Economy) appeals from an order of the circuit court of Cook County, confirming a decision of the Illinois Workers' Compensation Commission (Commission), which awarded the claimant, Ramona Navarro, temporary total disability (TTD) and permanent total disability (PTD) benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2002)). Economy contends that the Commission failed to apply the correct standard in determining that the claimant, as an undocumented alien, was entitled to PTD benefits. It further contends that the evidence does not support the Commission's finding that the claimant was permanently and totally disabled. For the reasons stated below, we affirm.

## BACKGROUND

The claimant filed an application for adjustment of claim under the Act, seeking benefits for injuries that she allegedly received while in the employ of Economy on May 7, 2002. The following facts relevant to our resolution of this appeal are taken from the evidence presented at the arbitration hearing.

In 1992, the claimant was hired by Economy to work on an assembly line manually deboning chickens. The claimant, who was born in Mexico, admitted that she does not have the necessary paperwork to legally obtain employment in the United States and that, when she applied for her position at Economy, she presented documents that she received from a source other than the government.

On May 7, 2002, the claimant slipped while at work, hit the wall, and fell onto the floor, causing her to strike her head, right shoulder, hip, and buttocks. She reported the accident to her supervisor and was driven by a company employee to Concentra Medical Center.

According to the records from Concentra Medical Center, the claimant was diagnosed with a contusion of her shoulder and chest wall, prescribed ibuprofen, and restricted from performing any work with her right upper extremities. Over the next couple of weeks, the claimant continued to receive treatment from Concentra Medical

Center and her family physician, Dr. Alvardo Jarava. Dr. Jaravo subsequently referred her to an orthopedic surgeon, Dr. Daniel Newman.

On May 30, 2002, the claimant first met with Dr. Newman. Dr. Newman diagnosed the claimant with a grade 3-4 sprain of the acromioclavicular joint with significant displacement of the distal clavicle and recommended that she undergo physical therapy.

When the physical therapy proved ineffective, Dr. Newman suggested surgery. On November 1, 2002, the claimant underwent a resection of the distal clavicle and reconstruction of the coracoclavicular ligament.

The claimant continued to treat with Dr. Newman postoperatively. In January of 2003, Dr. Newman returned the claimant to work with the restrictions of no lifting over 10 pounds and no work above the shoulder. The claimant, however, testified that her shoulder prevented her from returning to her job at Economy.

On April 15, 2003, Dr. Newman found the claimant to be at maximum medical improvement and recommended that she return to work with a permanent restriction of lifting 10 pounds or less and no work above her shoulder level. After the claimant was again unable to return to her position at Economy, Dr. Newman believed that she could no longer work at an assembly-line job which required the use of her right upper extremity. On May 13, 2003, Dr. Newman found that the claimant was permanently disabled and noted that he was not "planning on having her return to any type of gainful employment in the future." However, in a subsequent report dated July 29, 2003, Dr. Newman noted that the claimant was still unable to perform any work above her shoulder level and could not perform any significant lifting on her right side, but that "vocational rehab" was seeking a position for her that would not require these activities. In the July 29, 2003, report, Dr. Newman believed that the claimant could still be gainfully employed.

At the hearing, the claimant testified that she was 60 years old. Prior to coming to the United States in 1982, she attended school for three years in Mexico and then worked on a farm. The claimant stated that she did not receive any additional education beyond those three years. She further testified that she speaks Spanish and cannot speak, read, or write in English. She also does not drive an automobile.

The claimant stated that she continues to experience pain in her right shoulder. She testified that she cannot lift her right arm much above her shoulder and that she has no strength in her right arm. According to the claimant, her condition has caused her not to seek employment since the summer of 2003.

The claimant sought a vocational evaluation from Julie Bose, a vocational rehabilitation counselor. Bose met with the claimant on November 24, 2003, and reviewed her medical records. Based on the claimant's age, her limited education and communication skills, and her work restrictions that limited her to less than sedentary work, Bose opined that no stable labor market existed in which the claimant was employable. Bose further testified that, given the claimant's current circumstances, she would not be employable, even if she were a citizen of the United States.

James Breen, a vocational rehabilitation case manager engaged by Economy, also conducted a vocational assessment of the claimant. He met with the claimant on July 23, 2003, and performed a labor market survey. Breen believed that, not taking into account the claimant's inability to legally obtain employment, she would be able to perform a wide range of unskilled sedentary work occupations, such as a fast-food worker, laundry worker, or sandwich maker. He further opined that, if the claimant could legally work in the United States, she could be gainfully employed in the current labor market. Breen, however, agreed that claimant was not a candidate for vocational rehabilitation.

At the conclusion of the hearing, an arbitrator found that the claimant suffered an accidental injury on May 7, 2002, arising out of and in the scope of her employment with Economy. The arbitrator awarded the claimant TTD benefits in the sum of $146.67 per week for a period of 60 weeks and PTD benefits in the amount of $371.12 per week for life. In determining that the claimant was entitled to PTD benefits, the arbitrator found that she was permanently and totally disabled under the "odd-lot" doctrine. Specifically, the arbitrator noted:

> "[The claimant] is not obviously unemployable and the medical evidence indicates that [the claimant] is limited to less than sedentary work. Mr. Breen admitted that [the claimant] is not a candidate for vocational rehabilitation. The Commission has previously held that a [claimant] is entitled to rehabilitation services that are needed to provide [the claimant] with the physical and occupational skills necessary to enable her to resume working in any country where she would be legally entitled to work (*Tomayo vs. American Excelsior and Labor World, Inc.*, (99 IIC 521). The Arbitrator places greater weight on the opinions of Julie Bose and finds that [the claimant's] age, lack of education, lack of transferable skills, inability to speak English and physical restrictions render her unfit to perform any but the most menial task for which no stable labor market exists. (*A.M.T.C. of Illinois, Inc. v. Industrial Commission*, 77 Ill. 2d 482, 397 N.E.2d 804, 34 Ill. Dec. 132 (1979), *Courier v. Industrial Commission*, 282 Ill. App. 3d 1, 668 N.E.2d 28, 217 Ill. Dec. 843 (5th Dist. 1996)."

Economy filed a petition for review of the arbitrator's decision before the Commission. The Commission subsequently affirmed and adopted the arbitrator's decision.[1]

Thereafter, Economy sought judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

## ANALYSIS

Economy argues that the Commission applied the incorrect standard in awarding PTD benefits to the claimant. It asserts that a different standard should apply when determining whether suitable employment is available to an undocumented alien, as potential employers are barred by the Immigration Reform and Control Act of 1986 (IRCA) (8 U.S.C. §1324a *et seq.* (2000)) from hiring undocumented aliens regardless of their physical capabilities, and, therefore, an undocumented alien is always unemployable. Accordingly, Economy maintains that before an undocumented alien, such as the claimant, can receive PTD benefits under the "odd-lot" category, she must establish that she is not employable, due to her age, training, education, and experience, in a country where she is legally entitled to work.

The Act imposes liability on employers for injuries to employees arising out of and in the course of employment. 820 ILCS 305/2 (West 2002). "Employee" is defined as "[e]very person in the service of another under any contract of hire *** including aliens." 820 ILCS 305/1(b)(2) (West 2002). The Act, however, does not define "aliens."

■ In interpreting a statute, undefined words are given their plain and ordinary meaning. *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 243, 848 N.E.2d 1 (2005). When unmodified, the term "alien" is broad enough in scope to encompass any "person who resides within the borders of a country but is not a citizen or subject of that country."

---

[1] We note that attached to the Commission's decision is a purported dissent by Commissioner Ulrich, in which she writes, "I respectfully dissent from the majority and would affirm and adopt the Arbitrator's decision for reasons set forth in his decision at arbitration." As the decision signed by both Commissioner Rink and Commissioner Sherman also affirms and adopts the decision of the arbitrator, it is unclear whether the Commission's decision was unanimous or actually contains a dissent. Nevertheless, the arbitrator's decision was affirmed and adopted by, at least, a majority of the panel of commissioners, and, therefore, the Commission's decision complies with the Act. See 820 ILCS 305/19(f) (West 2002) ("The decision of a majority of the members of the panel of the Commission, shall be considered the decision of the Commission").

Black's Law Dictionary 72 (7th ed. 1999). The plain meaning of "aliens," therefore, includes not only foreign-born citizens that can legally work in the United States, but also those that cannot. Had the legislature intended otherwise, it could have defined the term or modified it with more specific language. See *People v. Scharlau*, 141 Ill. 2d 180, 193, 565 N.E.2d 1319 (1990) (noting that where the legislature intends for language to apply to a certain situation without restriction, it will generally use a single, compendious word). Consequently, we conclude that all aliens in the service of another pursuant to a contract for hire, regardless of their immigration status, are considered "employees" within the meaning of the Act and, under Illinois law, are entitled to receive workers' compensation benefits, including PTD benefits.

■ Pursuant to the IRCA, however, it is unlawful for an employer to knowingly hire an undocumented alien. 8 U.S.C. §1324a(a)(1)(A) (2000). To enforce this policy, the IRCA mandates that employers verify that a newly hired individual is authorized to work in the United States by examining specified documents. 8 U.S.C. §1324a(a)(1)(B) (2000). Similarly, if an employer later discovers that it unknowingly hired an undocumented alien, or if an alien becomes unauthorized to work while employed, the employer must discharge the worker. 8 U.S.C. §1324a(a)(2) (2000). The IRCA also makes it unlawful for an alien to use or attempt to use "any forged, counterfeit, altered, or falsely made document" or "any document lawfully issued to or with respect to a person other than the possessor" for the purpose of obtaining employment in the United States. 8 U.S.C. §§1324c(a)(2), (a)(3) (2000).

In this case, it is undisputed that the claimant violated the provisions of the IRCA by using false documents to obtain employment with Economy. The initial question before this court, therefore, is whether the Commission's award of PTD benefits to the claimant is preempted by the IRCA.

■ The doctrine of federal preemption arises from the supremacy clause of the United States Constitution, which states, *inter alia*, that "the Laws of the United States *** shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. Preemption may be either explicitly stated in the federal statute's language or implicitly contained in its structure or purpose. *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53, 73 L. Ed. 2d 664, 675, 102 S. Ct. 3014, 3022 (1982). Where, as in this case, the law at issue involves the state's historic police powers to regulate public safety, there is a presumption that the state law is not preempted " 'unless that was the clear and manifest purpose of Congress.' [Citation.]" *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 51 L. Ed. 2d 604, 614, 97 S. Ct. 1305, 1309 (1977).

The IRCA does not expressly preempt state laws allowing undocumented aliens, who sustain workplace injuries, to recover workers' compensation benefits, including PTD benefits. Rather, the IRCA contains an express preemption clause, which provides that "[t]he provisions of this section preempt any State or local law imposing civil or criminal sanctions *** upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. §1324a(h)(2) (2000). A sanction is generally defined as "[a] penalty or coercive measure that results from failure to comply with a law, rule, or order." Black's Law Dictionary 1341 (7th ed. 1999). By contrast, workers' compensation benefits are designed to compensate an employee for injuries arising out of and in the scope of employment regardless of fault (*Schrock v. Shoemaker*, 159 Ill. 2d 533, 542, 640 N.E.2d 937 (1994)) and, therefore, cannot reasonably be considered a "sanction." However, the mere fact that a state law does not fall within an express provision regarding preemption does not necessarily foreclose the possibility that the state law may be preempted by implication. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-88, 131 L. Ed. 2d 385, 393, 115 S. Ct. 1483, 1487-88 (1995). Consequently, we will consider the applicability of both forms of implicit preemption, field preemption and conflict preemption.

■ Field preemption occurs where "federal law so thoroughly occupies a legislative field ' "as to make reasonable the inference that Congress left no room for the States to supplement it." ' [Citation.]" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 120 L. Ed. 2d 407, 423, 112 S. Ct. 2608, 2617 (1992). Although the IRCA throughly addresses the hiring of undocumented aliens, nothing in the IRCA or its accompanying regulations indicates that Congress sought to supersede state laws providing workers' compensation benefits to injured employees, whether undocumented or otherwise. To the contrary, the IRCA's legislative history suggests that the statute was not intended "to undermine or diminish in any way labor protections in existing law." H.R. Rep. No. 99—682(I), at 58 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5662. Accordingly, we conclude that field preemption does not bar an award of PTD benefits to undocumented aliens under the Act.

■ We, likewise, believe that the award of PTD benefits to an undocumented alien is not precluded by conflict preemption. Conflict preemption exists " 'where compliance with both federal and state regulations is a physical impossibility ...' [citation] or where the 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.]" *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 55 L. Ed. 2d 179, 188-89, 98 S. Ct. 988, 994 (1978).

In *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 152 L. Ed. 2d 271, 122 S. Ct. 1275 (2002), the United States Supreme Court considered whether the National Labor Relations Board had the authority to award back pay to an undocumented worker who was unlawfully terminated for supporting efforts to unionize. The worker, who was a citizen of Mexico, had gained employment by presenting false work-authorization documents in violation of the IRCA. The Court concluded that allowing the National Labor Relations Board to award back pay to an undocumented alien would conflict with federal immigration policy, as expressed in the IRCA. *Hoffman*, 535 U.S. at 151, 152 L. Ed. 2d at 283-84, 122 S. Ct. at 1284. In reaching this conclusion, the Court found that the National Labor Relations Board had no authority to award back pay to an undocumented alien "for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud." *Hoffman*, 535 U.S. at 149, 152 L. Ed. 2d at 149, 122 S. Ct. at 1283. The Court further observed that "[t]here is no reason to think that Congress nonetheless intended to permit back-pay where, but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities." *Hoffman*, 535 U.S. at 149, 152 L. Ed. 2d at 282, 122 S. Ct. at 1283.

The PTD benefits awarded in this case are fundamentally distinct from the back pay at issue in *Hoffman*. Had the employer in *Hoffman* not terminated the undocumented worker for attempting to unionize, the IRCA effectively required that the worker be discharged. Accordingly, the undocumented worker in *Hoffman* was not legally entitled to wages during the period for which back pay was awarded. See *Hoffman*, 535 U.S. at 149, 152 L. Ed. 2d at 282, 122 S. Ct. at 1283. Unlike the undocumented alien in *Hoffman*, the claimant in this case has suffered a loss of earning unrelated to her violation of the IRCA. Although the IRCA prevents the claimant from legally working in the United States, she would still be able to work elsewhere had she not sustained a work-related injury. As a consequence, the award of PTD benefits to the claimant is separate and distinct from any continuing violation of the IRCA and, therefore, does not conflict with federal immigration policy.

Furthermore, the primary purpose of the IRCA is to diminish the employment "magnet that attracts aliens here illegally." H.R. Rep. No. 99—682(I), at 46 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5650. However, we do not believe that eligibility for workers' compensation benefits in the event of a work-related accident can

realistically be described as an incentive for undocumented aliens to unlawfully enter the United States. Rather, excluding undocumented aliens from receiving certain workers' compensation benefits would relieve employers from providing benefits to such employees, thereby contravening the purpose of the IRCA by creating a financial incentive for employers to hire undocumented workers. See *Dowling v. Slotnik*, 244 Conn. 781, 796, 712 A.2d 396, 404 (1998); *Rajeh v. Steel City Corp.*, 157 Ohio App. 3d 722, 731, 813 N.E.2d 697, 703 (2004). Finding nothing to suggest that the PTD benefits granted to the claimant under the Act would stand as an obstacle to the purposes and objectives of Congress in enacting the IRCA, we conclude that conflict preemption does not prevent an award of PTD benefits to an undocumented alien.

Based on the foregoing analysis, we find that the IRCA does not preempt, either expressly or implicitly, an award of PTD benefits to an undocumented alien. In so concluding, we note that courts in other jurisdictions have almost uniformly held that the IRCA does not preclude undocumented aliens from receiving workers' compensation benefits. See *Farmer Brothers Coffee v. Workers' Compensation Appeals Board*, 133 Cal. App. 4th 533, 542, 35 Cal. Rptr. 3d 23, 29 (2005); *Champion Auto Body v. Industrial Claim Appeals Office*, 950 P.2d 671, 673 (Colo. App. 1997); *Dowling*, 244 Conn. at 797, 712 A.2d at 405; *Safeharbor Employer Services I, Inc. v. Velazquez*, 860 So. 2d 984, 986 (Fla. App. 2003); *Continental Pet Technologies, Inc. v. Palacias*, 269 Ga. App. 561, 564, 604 S.E.2d 627, 631 (2004); *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 739-40, 882 A.2d 817, 829-30 (2005); *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 331 (Minn. 2003); *Ruiz v. Belk Masonry Co.*, 148 N.C. App. 675, 679, 559 S.E.2d 249, 252 (2002); *Mendoza v. Monmouth Recycling Corp.*, 288 N.J. Super. 240, 248, 672 A.2d 221, 225 (1996); *Cherokee Industries, Inc. v. Alvarez*, 84 P.3d 798, 799-801 (Okla. Civ. App. 2003); *Reinforced Earth Co. v. Workers' Compensation Appeal Board*, 749 A.2d 1036, 1038-39 (Pa. Commw. Ct. 2000). Indeed, we have only been able to uncover a single case in which an award of workers' compensation benefits was found to be preempted by the IRCA. See *Tarango v. State Industrial Insurance System*, 117 Nev. 444, 456-57, 25 P.3d 175, 183 (2001) (upholding an award of permanent partial disability benefits to an undocumented alien, but finding that the IRCA preempted an award of vocational rehabilitation benefits that would facilitate future employment within the United States).

Having found that the IRCA does not preempt the Commission's authority to award PTD benefits to an undocumented alien, we next consider whether an undocumented alien can prove she is totally and

permanently disabled pursuant to the test traditionally applied to injured employees who fall within the "odd-lot" category. In this case, the Commission, in adopting the decision of the arbitrator, found the claimant to be permanently and totally disabled under the "odd-lot" category based on the claimant's age, lack of education, lack of transferable skills, inability to speak English, and physical restrictions.

Whether a claimant is totally and permanently disabled is a question of fact to be resolved by the Commission. *Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 901, 810 N.E.2d 54 (2004). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite result must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992).

■ An employee is totally and permanently disabled when she is unable to make some contribution to the work force sufficient to justify the payment of wages. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286, 447 N.E.2d 842 (1983). An employee, however, need not be reduced to total physical incapacity before a permanent total disability award may be granted. *Ceco Corp.*, 95 Ill. 2d at 286. Instead, the employee must show that she is unable to perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them. *A.M.T.C. of Illinois, Inc., Aero Mayflower Transit Co. v. Industrial Comm'n*, 77 Ill. 2d 482, 487, 397 N.E.2d 804 (1979).

■ Where an employee's disability is of a limited nature such that she is not obviously unemployable, or where there is no medical evidence to support a claim of total disability, the employee has the burden of establishing that she falls into the "odd-lot" category—one who, though not altogether incapacitated from work, is so handicapped that she will not be employed regularly in any well-known branch of the labor market. *Ceco Corp.*, 95 Ill. 2d at 287. There are two ways an employee can ordinarily satisfy her burden of proving that she fits into the "odd-lot" category: (1) by showing a diligent but unsuccessful job search, or (2) by demonstrating that because of her age, training, education, experience, and condition, she is unable to engage in stable and continuous employment. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544, 865 N.E.2d 342 (2007). Once the employee has initially established the unavailability of employment to a person in her circumstances, the burden then shifts to the employer to show that suitable work is regularly and continuously available to the employee. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 547, 419 N.E.2d 1159 (1981).

■ As Economy correctly contends, the traditional test to

determine whether an employee falls into the "odd-lot" category cannot be applied to undocumented aliens. Because an undocumented alien's immigration status renders her unemployable as a matter of law (see 8 U.S.C. §1324a(a) (2000)), such an alien would always be able to demonstrate, and an employer would be unable to refute, that no jobs are available regardless of the alien's condition.[2] Nevertheless, we believe that an undocumented alien may establish that she is permanently and totally disabled under the "odd-lot" doctrine, so long as her unemployability is not based upon her immigration status.

Although this issue appears to be one of first impression in Illinois, other jurisdictions have considered what must be proven in order to establish an undocumented alien's entitlement to workers' compensation benefits. In *Gayton v. Gage Carolina Metals Inc.*, 149 N.C. App. 346, 560 S.E.2d 870 (2002), the North Carolina Court of Appeals rejected an employer's argument that, due to an undocumented alien's immigration status, it was theoretically impossible to prove that the alien would be employable. *Gayton*, 149 N.C. App. at 349-50, 560 S.E.2d at 872-73. The *Gayton* court observed that, although federal immigration law prevented an undocumented alien from returning to the same pre-injury job or any other job in the United States, federal law does not prohibit conducting a labor market survey to determine what suitable jobs, if any, are available that an undocumented alien might be able to obtain but for her immigration status. *Gayton*, 149 N.C. App. at 350, 560 S.E.2d at 873. The court further noted that an employer was not required to prove that a specific job had already been offered to the injured employee. *Gayton*, 149 N.C. App. at 350, 560 S.E.2d at 873. As North Carolina law provides that workers' compensation benefits are not terminated until the employer proves that the employee can return to work at wages equal to those she was receiving at the time the injury occurred, the *Gayton* court held that the employer has the burden of proving that suitable jobs are available to the undocumented alien "but for" her immigration status. *Gayton*, 149 N.C. App. at 350, 560 S.E.2d at 873.

While the Illinois Workers' Compensation Act and the North Carolina law differ, we believe that the reasoning employed by the *Gayton* court is sound. Furthermore, like North Carolina, Illinois does

[2]Economy further asserts that the traditional test cannot be applied to an undocumented alien because a lawful employer cannot mitigate its damages either by returning an injured employee to work in a modified capacity or providing job placement services, without violating the IRCA. The Commission, however, found that the claimant was incapable of returning to work. Consequently, the issue of mitigation is not relevant to the facts of this case.

not require that an employer establish that an actual job is available to an injured employee, only that suitable work is regularly and continuously available. See *Valley Mould & Iron Co.*, 84 Ill. 2d at 547. Applying this reasoning to the "odd-lot" doctrine, we conclude that an undocumented alien has the initial burden of proving that she cannot sustain regular employment in a well-known branch of the labor market without regard to her undocumented status. The burden then shifts to the employer to produce sufficient evidence that suitable jobs would be regularly and continuously available to the undocumented alien but for her legal inability to obtain employment.

■ In this case, neither of the vocational experts considered the claimant's immigration status when proffering their opinions. Bose, the claimant's vocational expert, believed that, based on the claimant's age, her limited education and communication skills, and her work restrictions, no stable labor market existed in which the claimant was employable. She further testified that, given the claimant's current circumstances, she would not be employable, even if she were a citizen of the United States. Breen, Economy's rehabilitation expert, opined that, not taking into account the claimant's inability to legally obtain employment, she could be gainfully employed in the current labor market.

It was the function of the Commission to judge the credibility of the witnesses and resolve conflicting evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). In concluding that the claimant was permanently and totally disabled, the arbitrator, whose decision was adopted by the Commission, relied upon Bose's opinion. As Bose believed that the claimant's condition prevented her from engaging in stable employment without regard to her legal right to work in the United States, the Commission's finding that the claimant is permanently and totally disabled is supported by competent evidence. We, therefore, conclude that the Commission's decision to award the claimant PTD benefits is not against the manifest weight of the evidence.

## CONCLUSION

In sum, we conclude that the Act allows workers' compensation benefits, including PTD benefits, to be awarded to undocumented aliens and that an award of such benefits is not preempted by federal immigration law. Additionally, we hold that, for an undocumented alien to establish that she is permanently and totally disabled under the "odd-lot" doctrine, she must first prove that she cannot sustain regular employment in a well-known branch of the labor market without regard to her undocumented status. The burden then shifts to

the employer to prove that, but for the undocumented alien's legal inability to obtain employment, suitable work would be regularly and continuously available. Applying this test to the record before us, we cannot say that the Commission's award of PTD benefits to the claimant is against the manifest weight of the evidence. For these reasons, we affirm the judgment of the circuit court which confirmed the decision of the Commission.

Affirmed.

McCULLOUGH, P.J., and GROMETER and DONOVAN, JJ., concur.

JUSTICE HOLDRIDGE, specially concurring:

I concur in the majority's holding but write separately to comment further on the fact that illegal aliens are employees under the Act. As quoted by the supreme court in 1916, the Act originally defined the term "employee" as " 'every person in the service of another under any contract of hire, express or implied, oral or written, including aliens, and minors who are legally permitted to work under the laws of the State.' " *Victor Chemical Works v. Industrial Board of Illinois*, 274 Ill. 11, 20, 113 N.E. 173 (1916). This language plainly shows the legislature's intent that illegal aliens qualify as employees. When the legislature wanted to delineate between legal and illegal workers of a particular type, it did so explicitly—as evidenced by its treatment of minors. No such delineation applied to aliens, and the relevant statutory language remains unchanged today.

The early delineation of minors along legal and nonlegal lines was soon changed. As the supreme court explained:

"Section 5 of the act, prior to its amendment in 1927, included 'minors who are legally permitted to work under the laws of this State.' By the amendment of 1927 the words 'who are legally permitted to work under the laws of this State' were stricken out, and by the terms of the amendment it was made to apply to every person in the service of another under any contract of hire, express or implied, oral or written, including minors." *Landry v. E.G. Shinner & Co.*, 344 Ill. 579, 583-84, 176 N.E. 895 (1931).

In other words, the legislature enacted a single, compendious term ("minors") to define the employment relationship. As a result, illegally employed minors became "employees" covered by the Act. See *Landry*, 344 Ill. 579, 176 N.E. 895. This change is telling for purposes of the instant case because the 1927 amendment described minors the same way that aliens were already described (and continue to be

described today). Thus, in concluding that illegal aliens are covered by the Act, we do not engage in judicial divination but merely apply the statutory language as plainly written.